ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| ECC International, LLC | ) | ASBCA Nos. 58993, 60167, 60283 |
| | ) | |
| Under Contract No. W912DQ-11-C-4009 | ) | |

APPEARANCES FOR THE APPELLANT:    R. Dale Holmes, Esq.
Amy M. Kirby, Esq.
  Cohen Seglias Pallas Greenhall & Furman, PC
  Philadelphia, PA

APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
Sarah L. Hinkle, Esq.
Michael E. Taccino, Esq.
Matthew Tilghman, Esq.
Kathryn G. Morris, Esq.
  Engineer Trial Attorneys
  U.S. Army Engineer District, Middle East
  Winchester, VA

## OPINION BY ADMINISTRATIVE JUDGE O'SULLIVAN

ECC International, LLC (ECCI or appellant), appeals from deemed denials of its claims arising from the performance of a contract with the U.S. Army Corps of Engineers (USACE, Corps, or government) to construct a Military Police School and a Signal School for the Afghan National Army at Camp Shaheen, Afghanistan. Three primary issues are presented in these appeals: (1) the "collapsible soils claim" contends that ECCI is entitled to be compensated for the cost of mitigating collapsible soils found at the site because, by accepting ECCI's offer which excluded collapsible soil mitigation from its bid, the Corps awarded a contract that excluded that work; (2) the "BCOE claim" contends that USACE unreasonably imposed and enforced a period of performance that it had reason to know would be difficult to impossible to accomplish, and is liable for the damages caused; and (3) the "DBA insurance claim" contends that USACE wrongly deprived ECCI of reimbursement for DBA insurance premiums that ECCI actually paid, and for which it was entitled to be reimbursed. We have jurisdiction under the Contract Disputes Act, 41 U.S.C. §§ 7101-7109. We sustain the appeals.

FINDINGS OF FACT

Background and Contract Provisions

1. The United States Army Corps of Engineers, Kansas City District (NWK), awarded Contract No. W912DQ-11-C-4009 (the contract) to ECCI on April 8, 2011. The contract was for the construction of a Military Police School and a Signal School for the Afghan National Army as part of a planned expansion of Camp Shaheen in the Mazar-e-Sharif area, Balkh Province, Afghanistan. The contract price as awarded was $27,613,870.20. (R4, tab 11 at GOV000322-24)

2. USACE, through the Afghanistan Engineer District – North (AED or AEN), performed contracting functions for the Combined Security Transition Command – Afghanistan (CSTC-A), for the design and construction of facilities for the Afghan National Army (ANA) throughout Afghanistan. In late 2010, with an increasing workload, AEN looked to certain Engineer Districts back in the United States for help in awarding contracts. (Tr. 10/20, 167-69) AEN specifically asked the Northwestern Division, Kansas City District (NWK or Kansas City), for help in awarding contracts for the Camp Shaheen expansion because many Corps employees working at NWK had previously deployed to Afghanistan and were familiar with the unique issues Afghanistan projects could present. (Tr. 7/143, 10/20, 172) In addition to the Military Police and Signal Schools, the Camp Shaheen expansion included a project called the Group A Expansion.

3. ECCI was one of several bidders on the Military Police (MP) and Signal School project, which was solicited by Kansas City on February 24, 2011 (R4, tab 4). ECCI also bid on the Group A Expansion, which was solicited on March 29, 2011 (R4, tab S-733). The Group A project was also awarded to ECCI, on May 17, 2011 (R4, tab S-48 at 36).

4. The MP/Signal School and Group A Expansion project sites were adjacent to one another (R4, tab S-545 at 8). The projects were similar in that both employed arch span structures[1] for most of the project square feet. The MP/Signal School contract called for a total of 20,039 square meters of arch span buildings (R4, tab 11 at GOV000380, GOV000484). The Group A Expansion contract called for a total of

---

[1] Arch span construction, also known as K-span construction (a proprietary term of M.I.C. Industries), is a streamlined process of erecting structures using machines to corrugate rolled steel and cranes to place the arch on top of a slab. The process speeds up construction and requires less material and labor than conventional brick and mortar construction. (Tr. 4/204-05, 217-18)

- A Glossary of Acronyms used throughout this opinion is appended at the end.

29,934 square meters of arch span buildings (R4, tab S-48 at 94-97).  Both contracts called for the use of austere design standards[2] (R4, tab 11 at GOV000369, GOV000475, R4, tab S-48 at 83).  The designs for the two projects were similar enough that at one point both projects were combined in the design review process (tr. 9/103-04).

5.  The MP/Signal School contract contained two separate specifications, one for the MP School and one for the Signal School.  The specification for the MP School called for 29 design-build facilities and 12 site adapt facilities to be constructed.  The Signal School specification called for the construction of 19 design-build facilities and 8 site adapt facilities.[3]  (R4, tab 11 at GOV000380-81, GOV000484)  Both specification sections required that the contractor complete the designs for the design build facilities. For the site adapt facilities, the contractor was to complete construction in conformance with the standard design drawings provided.  (*Id.* at GOV000380-81, GOV000484)

6.  The MP/Signal School solicitation and contract as awarded contained "Design Concept Documents" that were not standard designs but were to be used by the contractor as "the basis for the project design and construction documents."  Following award, the contractor was to complete the design and construction documents and construct the project in accordance with the completed documents.  The design review process contemplated four submittals before the final design submission and encouraged the contractor to develop and submit "multiple cost saving proposals for innovative design alternatives."  (R4, tab 9 at GOV000174, tab 11 at GOV000359)  The contract contains the following Order of Precedence clause with respect to design:

> **5.2 ORDER OF PRECEDENCE**
> In case of conflict, duplication, or overlap of design criteria specified in the documents referenced in this section, the following order of precedence shall be followed:
>
> 1. Contract Award Document and referenced publications therein;
> 2. Written requirements and specifications;
> 3. Drawings.

---

[2] "Austere design" is a design philosophy employed in Afghanistan that embraces minimalistic design of facilities that are easily operated, have low maintenance requirements, and use construction methods tailored to the local workforce (R4, tab S-587 at 2).

[3] Generally speaking, design-build means that the contractor designs the building to the project owner's criteria and then constructs it to the approved design.  Site-adapt means that the contractor receives an existing design from the project owner and adapts the design to fit a specific site, taking into account the existing physical characteristics of the land.

(R4, tab 11 at GOV000362-63)  This section further provides that only the work plan, boundary survey plan, and topographic survey plan are mandatory design criteria, and that all other criteria are considered non-mandatory and may be enhanced, improved, or substituted to better suit design requirements (*id.* at 363).

### I. *The Collapsible Soils Claim, ASBCA No. 58993*

7.  Soils in Afghanistan include a type known as loess.  To oversimplify, loess is a kind of fine silt left behind as glaciers melt.  Winds will pick up the particles and blow them to other locations where, with time, other material such as clay or calcium carbonate will seep down and glue the particles together.  However, with rain or other water sources, the glue, depending on what it is in a particular location, may break down.  Not all loess soils are considered to be collapsible soils and, in most cases, one cannot tell from looking at the soil whether it is a loess deposit or not.  There are indirect tests geotechnical engineers can perform that will indicate whether the soil is potentially collapsible, but the only way to determine the degree of collapse risk is to run a consolidometer test known as the ASTM D-5333.  (Tr. 5/246-2530)[4]

8.  The two separate specifications for MP/Signal School required, in Section 01010, that the contractor was to perform a geotechnical investigation of the site and, if collapsible soils were present, the contractor should follow the procedures for mitigation provided in Section 01015 (R4, tab 11 at GOV000385, GOV000487).  The Signal School specification, Section 01015, para. 2.5.5, specified particular grading, drainage, and foundation preparation measures to be undertaken if collapsible soils were identified.  These measures included over-excavation to a depth of three meters within the entire building footprint and extension of the over-excavation 1.5 meters beyond the outer edge of the building footprint, then backfill with approved fill material in "loose lift" layers and compaction of the fill to specified densities.  (R4, tab 11 at GOV000509-10)  In contrast, the MP School specification Section 01015 contained no collapsible soil mitigation measures (R4, tab 11 at GOV000410-11).

9.  During the time that the solicitation was pending and before bids were due, one of the bidders posed a question to USACE about the differing specifications:

> Could you please confirm "excavate the footings 3.0 meters
> below the level of intended bottom of the footing foundation"

---

[4] Testimony of Dr. Charles Neubauer, appellant's expert in structure and soil mechanics. The government's testifying expert, Dr. (Lt. Col) Christopher Senseney, substantially agreed with Dr. Neubauer on these points.  (Tr. 6/239-40, 245, 7/135-36)

is requirement for both Military Police and Signal School sites since these are adjacent? Currently out of 2 Section 01015s . . . only one of them mentions collapsible soil mitigation.

(R4, tab S-79 at 6) USACE's response was, "Bid it as you see it." (*Id*.) No geotechnical information for the site was included in the solicitation, and the presence or absence of collapsible soils, as well as the degree of collapse risk, could not be definitively determined until after award, when the geotechnical investigation would be conducted (tr. 2/68-69, 70; R4, tab S-636 at 2).

10. The presence of collapsible soils in Afghanistan was not known to allied forces engaged in construction until the soil collapsed underneath buildings constructed for the ANA Garrison on the Kunduz plateau in northern Afghanistan in December of 2009. An April 30, 2010 report by the Special Inspector General for Afghanistan Reconstruction (SIGAR) found that severe soil settling after heavy rains had rendered several structures unusable. (R4, tab S-107 at 27)

11. Thereafter, USACE's approach to collapsible soils mitigation began to evolve, and was still evolving at the time the MP/Signal School solicitation was issued. Following the Kunduz plateau collapse, USACE recognized the need to assess collapse risk and began requiring that geotechnical investigations at project sites include the ASTM D-5333 test for the severity of collapse risk. (R4, tabs S-558, S-600, S-616; tr. 9/214) Both testifying geotechnical experts (for ECCI and the government) agreed that the ASTM D-5333 test, while it may be difficult for geotechnical engineering firms to perform correctly, is the only test that will accurately predict the *degree* of collapse risk presented at a particular site (tr. 5/249-50, 276, 7/135-36). Indirect tests, such as comparing the liquid limits versus dry density of soil samples, can determine the potential presence of collapsible soils, but not the degree of collapse risk (tr. 5/249-50).

12. The degree of collapse risk revealed by the ASTM D-5333 testing is categorized as "slight" by the test itself if the results are between 0.1 to 2 percent. Two other authoritative sources are the NAVFAC (Naval Facilities Engineering Command) Design Manual 7.01, Soil Mechanics, and the USACE Engineering Manual (EM) 1110-1904. The Board takes judicial notice of the NAVFAC Design Manual. Both the NAVFAC and the USACE Manuals characterize a result between zero and 1 percent as a zero or negligible collapse potential. The USACE Manual and the ASTM D-5333 characterize results in the 2.1% to 6% range as moderate risk, results in the 6.1% to 10% range as moderately severe risk, and anything above 10% as severe risk. (USACE EM 1110-1-1904 at 5-15; R4, tab S-558 at 5; tr. 2/48-51) The NAVFAC DM 7.01 at 7.1-41 characterizes results in the 2-5% range as "Moderate trouble," in the 5-10% range as "Trouble," and in the 10-20% range as "Severe Trouble."

5

13. At some point toward the end of 2010, USACE adopted an initial mitigation standard of over excavation of three meters (approximately 10 feet), based on calculations done by Juan Carlos Escajadillo, a USACE AEN engineer (tr. 9/203-04). This standard was described by USACE engineer Matthew Bird as "very conservative," time consuming, and expensive (tr. 7/190-91). Mr. Escajadillo testified that this standard did not take into account the different degrees of collapse risk that would be revealed by ASTM D-5333 testing (tr. 9/215-16). On April 14, 2011 (only six days after award of the MP/Signal School contract), USACE NWK engineer Scott Mensing emailed Mr. Escajadillo about the inclusion of this standard in the Group A Expansion (Camp Shaheen) solicitation:

> The current solicitation is generating comments on whether to include or not include the required excavation for the collapsible soils (which may or may not be present). Since the Contractor is required to provide their own geotechnical investigation and remediation, if necessary, NWK requests that we remove all language pertaining to collapsible soils in the project specifications. If collapsible soils are found during the investigation by the Contractor, then a mod will have to be issued for the additional work.

(R4, tab 590 at 3) This inquiry was forwarded to AEN engineer Matthew Bird, who responded:

> We prefer to keep the language in the solicitation. Collapsible soils are a huge issue here and the potential exists in a large portion of AED-N. . . . Without the language we are leaving the construction office open to millions of dollars in modifications, which will be severely inflated by nature.
>
> If the project is in Kunduz, then the project bid should include the . . . remediation of collapsible soil and the cost associated with it. Anywhere else collapsible soils should be treated as an option in the contract so that we know the cost up front.
>
> Please see the attached 01010 and 01015 regarding collapsible soils as a bid option and specific to Kunduz.

(*Id.* at 2) (The two different 01010 sections, but not the 01015 sections, were attached to these emails in the Rule 4 file. *Id.* at 4-11.) The 01010 specification for Kunduz differed from the version included in the Signal School specification in that excavation of three

6

meters was reserved for conditions involving "deep" collapsible soils to a depth of three meters or more (*id.* at 6).

14. Thus, by April 14, 2011, USACE settled on a course of including a mandatory specification for soil mitigation for projects in Kunduz and including a bid option for soil mitigation for projects outside the Kunduz area where the risk was less predictable. Under the mandatory specification, contractors were to assume that collapsible soils were present and include the cost of mitigation in their bid prices. (However, they would still not know how deep the excavation had to be until a geotechnical investigation was conducted after award of the contract.) Under the bid option approach, contractors were to price the work without the cost of soil mitigation, but include a priced option for mitigation that could be exercised by the government should the requisite degree of collapse risk be discovered following the geotechnical investigation. (R4, tab S-590; tr. 2/114-17) The MP/Signal School contract, awarded on April 8, 2011, did not contain a bid option for mitigation of collapsible soils (R4, tab 11). The Group A Expansion solicitation, however, was amended after April 14, 2011 to contain a bid option for mitigation of 5000 cubic meters of soil (tr. 2/118-19).

15. ECCI, at the time of bidding on the MP/Signal School solicitation, had been working on Camp Shaheen since 2008 and had not experienced or observed any issues with collapsible soils. Its experience elsewhere in Afghanistan (except for the Kunduz plateau) was similar. For instance, ECCI had completed three projects in the Mazar-e-Sharif area, approximately 90 miles from the Kunduz plateau, under task orders (TO) 4, 5, and 8 under old MATOC.[5] The geotechnical investigations for those projects had been completed and had not found collapsible soils to be present.[6] The buildings for TOs 4 and 5 were constructed in 2008 and completed in 2010 and exhibited no collapse issues as of 2014 (tr. 2/44-45, 49-50). The site for TO 8 was on Camp Shaheen (tr. 2/51), and involved 17 buildings spread across the camp, including one location adjacent to the MP/Signal School site (tr. 2/45, 51, 57-58). The buildings in that location were two-story barracks with a design bearing load of 2000 pounds per square foot, greater than the design bearing load for the MP/Signal School project buildings at 1500 pounds per square foot (tr. 2/59-60). Mr. Hayward testified that problems with collapsible soil, if any existed, would be more likely to manifest with the higher load buildings, but no issues were observed from the time the buildings were completed in early 2011 through 2014, when ECCI was finishing up the MP/Signal School project (tr. 2/58-60).

---

[5] Old MATOC and new MATOC are multiple award task order contracts under which USACE conducted competitions for the award of task orders for individual projects.

[6] At this time, there was not the level of concern about collapsible soils that emerged later and no requirement to conduct the ASTM D-5333 test as part of the geotechnical investigation (tr. 2/49-50).

16. In addition to its own buildings, ECCI did not observe any signs of cracking or settling in any other buildings on Camp Shaheen during the three years it was working there before bidding on MP/Signal School (tr. 2/51-52, 10/283-84). ECCI's expert witness, Dr. Charles Neubauer, testified that one of the best indicators of collapsible soil is the presence of buildings showing signs of failure (tr. 5/279, 251-52). The Signal School's collapsible soils mitigation requirements, including the 3.0 meters of over excavation under foundation footings, mirrored what USACE was requiring for projects on the Kunduz plateau, where there was a known problem. But there was no known problem at Camp Shaheen.

17. Mitigation of collapsible soils at both the MP School and Signal School sites, to the degree required by the Signal School specification (three meters), would have been, as confirmed by USACE engineer Matthew Bird (finding 13), very expensive. Mr. Hayward described the problem in an internal ECCI email shortly before proposals were due:

> Here's the dilemma... the cost to do the overexcavation for both projects is at least $2 million (Omran has indicated $2 million) but I think the cost is probably over $5 million if we do everything stated in the Tech Requirements of the Signal School for both projects. It is completely unreasonable for the Government to leave this kind of unknown and significant cost issue up in the air on a fixed price contract. The RFP doesn't say the soil is collapsible. It just says that if it is, then you must do the additional work. If we include the cost in the bid we will not win. If we leave it out and the soil is determined to be collapsible, we will probably have a significant and time consuming fight on our hands, because the contract explicitly says that if the soil is collapsible, the[n] do the work. It is crazy for the Gov to have not defined which way the bidders should assume on this issue. But I think the just as crazy answer to the question might give us the room we need to assume the soil is not collapsible, and if it is, it is a change. The Gov will say it's not an unforeseen condition because the contract clearly identified the possibility that the soil was collapsible. Our response could be that, as instructed, we bid it as we saw it and we didn't have any collapsible soil issues on TO 8 at Camp Shaheen so we reasonably assumed the soil wasn't collapsible.

(R4, tab S-78 at 1-2)

8

18. Without a bid option available to mitigate the substantial uncertainties inherent in the solicitation, ECCI determined to "bid it as it saw it," and excluded any cost for collapsible soil modification from its price proposal. ECCI's proposal spelled out its rationale for excluding the cost in a full page bid clarification sheet immediately following the SF 1442 form into which it inserted its bid prices for the work, and before the detailed pricing information. In relevant part, ECCI stated:

> Based on (1) the Government's bidder inquiry response to "*Bid it as you see it*"; (2) the language in Section 01010, Paragraphs 4.16 and 4.17, which states that "*Existing geotechnical information is not available at the project site*" and that mitigation measures are only required if collapsible soils are discovered; and (3) our experience at Camp Shaheen and the Mazar-e-Sharif area in general, where we have not experienced collapsible soil issues; we believe the probability of discovering collapsible soils at the site is very low. Therefore we do not anticipate having to execute the significant additional work described in the Signal School Section 01015, Paragraph 2.5.5 for either project and would view the discovery of collapsible soils as an unforeseen and changed site condition. We believe this approach provides the Government with the best possible pricing by excluding costly and schedule impacting mitigation measures that are unlikely to be required.

(R4, tab S-68 at 112)

19. The MP/Signal School contract was awarded to ECCI by USACE without a request for clarification or any questions or discussion. Mr. Jay Denker, the NWK contract specialist for the procurement, noted that it was the first solicitation and award that NWK had conducted on behalf of AEN (tr. 7/143). After the bid inquiry came in about the disparity between the MP and Signal School specifications regarding mitigation for collapsible soils, the response of "bid it as you see it" came from Mike McCollum in the NWK design branch. Mr. Denker "copied and pasted" that response and sent it out to the bidders. He interpreted the response as meaning the contractors are there on the ground and should use their professional judgment. (Tr. 7/149-50) When the proposals came in, and there were seven of them, he reviewed both the technical and the price proposal portions and then pushed them out to separate evaluation boards. There is a "firewall" between the two boards to ensure that the technical evaluation is made purely on technical factors and the price evaluation is made purely on price factors. (Tr. 7/151-55) In addition to Mr. Denker, the Source Selection Authority (Nicholas DeGuire), who made the source selection decision, had access to

9

both the technical and the price proposals submitted by all the offerors[7] (tr. 7/176).  It was the Source Selection Authority's decision not to seek any clarifications or to conduct discussions before making award (tr. 7/173).

20.  Following award to ECCI, the geotechnical investigation was conducted by Omran Geotechnical Company, an Afghan firm.  In its report submitted June 20, 2011, Omran included the results of the ASTM D-5333 test for the soils collected from various points on the project site.  The collapse index results ranged from .95% to 1.55%, with an average of 1.168%.  (R4, tab S-174 at 56; tr. 2/52)  Thus, the soils at the site presented a negligible to slight risk of collapse (finding 12).  Omran's report also recommended over excavation of 600 mm (60 cm) under building foundations, and 300 mm (30 cm) under slab on grade and sub base layers of roads and parking lots (R4, tab S-174 at 75).  Omran's initial report was C coded by USACE, requiring a re-submission (R4, tab S-15).  The revised report, submitted July 27, 2011, revised the over excavation recommendation to 300 mm under building foundations (R4, tab S-626 at 69).  A cover page submitted with the revised report called the government's attention to the revised over excavation recommendation (app. ex. 18).  USACE approved the revised report on August 17, 2011 (R4, tab S-16).  Mr. Hayward testified that his view was that a negligible to slight collapse risk did not require any mitigation, and noted that the contract as awarded did not specify a threshold level of collapse risk that would require mitigation (tr. 3/6).

21.  The testifying experts in this appeal presented differing views on whether ECCI should have anticipated the discovery of collapsible soils at the project site and included the cost for mitigation in their proposal.  Dr. Senseney[8] testified that by using indirect tests prior to bidding, a contractor could have determined whether the site was underlain with collapsible soils (tr. 7/26-27).  However, he declined to disagree with the analysis in a USACE engineer's report that indirect tests will indicate the *potential* presence of collapsible soils, requiring follow-up testing with the ASTM D-5333 (tr. 7/92).  It was his opinion that collapsible soils were widespread throughout Kunduz, but he had not himself observed building damage from collapsible soils in the Mazar-e-Sharif area where Camp Shaheen is located (tr. 7/80, 98-99).  Of the three bases for his opinion that ECCI should have foreseen collapsible soils at the MP/Signal site, two rely on the Omran geotechnical report that existed only after award and the conduct of a geotechnical investigation, and the other relies on a geotechnical report from the SOFJOC project at Camp Marmal, a site which is approximately 12 miles away from the MP/Signal School project site at Camp Shaheen, which found soils with negligible

---

[7] Mr. Denker drafted the source selection decision (R4, tab S-69; tr. 7/155).  The Source Selection Authority, Nicholas DeGuire, was not called to testify.

[8] Dr. (Lt. Col) Senseney was an Associate Professor at the Air Force Academy at the time of his testimony.  He has a Ph.D. in civil engineering from the Colorado School of Mines with a focus on geotechnical engineering.  He served two tours of duty in Afghanistan, from 2006 to 2007 and from 2012-2013.  (Tr. 6/230-31)

to slight collapse risk (indices ranging from 0.7% to 1.6%) (R4, tab S-13 at 42; tr. 7/112-15).

22. Dr. Charles Neubauer[9] disagreed with the government's contention that collapsible soils should have been anticipated by ECCI in and around Camp Shaheen. In fact, based on his personal experience with ECCI projects, there were collapsible soils at the Kunduz plateau and some were found at the old MATOC TO 3 site nearby, but they had not run into the problem at any of their other locations. Specifically, at the MP/Signal School site and Camp Shaheen generally, they had been working for three years and had seen no evidence of damage from collapsible soils. Since the government provided no geotechnical information whatsoever with the solicitation, and there was no evidence of collapsible soils in that area, in his opinion it was sensible not to bid mitigation. (Tr. 5/256-57)

23. USACE's position on collapsible soils and the appropriate mitigation therefor continued to evolve over the summer of 2011. As summarized by Mark Hoague, USACE's Chief of Engineering (AEN) from April of 2011 to April of 2013, following the Kunduz plateau collapse they started with a very conservative position of three meters over excavation under foundations. (Tr. 10/16, 83) USACE soon learned that was not going to work because there was constant pressure to speed up the construction and the extensive over excavation was slowing it down. Mr. Hoague decided USACE needed to take more risk. (Tr. 10/84) As of July 8, 2011, as geotechnical reports came in, his office was recommending 500 mm of over excavation for slight collapsibility, and 700 mm for moderate. He believed they did not see anything in excess of an ASTM D-5333 collapse index of 2.2 reported during this time frame. (Tr. 10/86) They were also recommending other measures, including surface treatment with a compacted clay top layer to prevent moisture from getting to the collapsible soils, sloping ground away from the buildings, and extending the downspouts three meters away from the building (tr. 10/86-87). But they were still getting pressure to do away with the over excavation altogether. In a new policy adopted September 24, 2011, they decided not to require over excavation for soils with collapse indices falling within the slight to moderate risk categories under ASTM D-5333 (*i.e*, a collapse index of 6% or less). Grading and drainage requirements would still apply. For collapsible soils with a collapse index of 6.1% or above, the minimum foundation mitigation would be over excavation of 700 mm

---

[9] Dr. Neubauer has a Ph.D. in Civil Engineering with a major in foundation engineering and a minor in geology from the University of Illinois. He began his career as a civil engineer with the United States Air Force, retiring at the rank of Colonel, then was at the National Aeronautics and Space Administration as Director of Space Shuttle Facilities from 1976 to 1986. He then held a number of positions in private industry, culminating in a position with ECCI as Director of ECCI's Design Build Center of Excellence, from which he retired in 2015. (R4, tab S-553)

and backfill with a structural fill. (Tr. 10/88-90; R4, tab S-644) Mr. Hayward of ECCI believed that it was an error not to require mitigation at a collapse index of 5-6%, but agreed it was not required at 2% or less (tr. 3/6-7).

24. USACE's September 24, 2011 policy was unevenly applied in practice. ECCI had a task order, TO 9, under the new MATOC. The work was about halfway between Kunduz and Mazar-e-Sharif, and the soils there had collapse indices up to 1.95%. ECCI received a letter from USACE on September 28, 2011, informing them that TO 9's bid option for mitigation of collapsible soils, which USACE had exercised at award, would be de-scoped since USACE, under the new policy, would not be requiring mitigation of soils with a "slight" collapse risk. (R4, tab S-649 at 1-2) ECCI inquired whether the new guidance would be applied to all projects in the Balkh, Samangan, and Kunduz provinces of Afghanistan (R4, tab S-649 at 1). At a meeting with USACE on October 1, 2011, ECCI was informed that projects would be evaluated on a case by case basis and it should submit an RFI (request for information) for each project (tr. 2/213-14). This information was followed up in a letter from USACE dated October 4, 2011, reiterating that "due to the uniqueness of each project site" the decision on mitigation would be handled on a site-by site basis; however, the criteria USACE would employ in making decisions were not articulated (R4, tab S-650).

25. ECCI submitted an RFI for MP/Signal School on October 3, 2011. It pointed out that the collapse indices ranged between 0.95% and 1.55% at the site and that mitigation would entail unnecessary additional costs (estimated at $900,000) and an adverse impact on schedule (three months delay). It also reminded USACE that it had excluded costs for mitigation from its bid and warned that it would view the discovery of collapsible soils at the site as a differing site condition. ECCI's recommendation was to cease all planned mitigation measures for the site, and it asked for USACE's prompt concurrence, since it was continuing to incur additional costs for which USACE would be liable. (R4, tab S-5 at 20)

26. USACE (Project Engineer William "Brad" Long) responded to the RFI on October 17, 2011, stating that the geotechnical report recommended over excavation of 30 centimeters, and "[w]ith the remainder of construction needed at the project site, the USACE recommends that it would be prudent to continue with the remainder over excavation as originally recommended...." (R4, tab S-5 at 20).

27. ECCI submitted a total of six RFIs for six projects. The responses it received from USACE recommended continuing with the mitigation work, despite the fact that four of the projects had soils with collapse indices with ranges less than 2%. One of the projects had ranges not exceeding 3%, and the last project had a range extending to 3.95%. (For the latter project, ECCI recommended continuing with the mitigation work even though the new policy established a threshold of 6.1%.) (R4, tab S-5 at 1-5, 16-21) ECCI believed that these RFI responses were driven by USACE's view that the

12

contractor would bear responsibility for the cost of mitigation on those projects (*id.* at 1). On TO 9, proceeding with mitigation would have meant that USACE would pay for it under the bid option that they had exercised, and on that TO USACE decided instead not to proceed with mitigation and to de-scope the optional CLIN from the contract (*id*. at 4).

28. The guidance provided by the project engineers in response to the RFIs was problematic to ECCI because it explicitly disclaimed any contractual effect. A standard note in bold font at the bottom of the RFI responses read:

> **The RFI system is intended to provide an efficient mechanism for responding to contractor's requests for information. It does not provide authority to proceed with additional work. If the contractor considers the RFI response a changed condition, provide written notice to the contracting officer's representative in accordance with contract provisions.**

(R4, tab S-5 at 16-21) ECCI therefore sought guidance from the ACO (Administrative Contracting Officer), Tyrone Crear, in an October 22, 2011 letter summarizing the inconsistent guidance that it was receiving on its various Afghanistan projects (R4, tab S-5). On November 1, 2011, ECCI followed up with a letter to the Contracting Officer's Representative (COR), Stan Dowdy, specifically referencing the MP/Signal School project. ECCI stated that after it received USACE's RFI response, it inquired whether an RFP would be forthcoming in order to price the additional work. Having not received a reply to that inquiry, it gave notice that it was stopping work on collapsible soils replacement activities and that it was being delayed by lack of contractual direction from the government. (R4, tab S-6) In response, the USACE ACO, Mr. Crear, issued a letter dated November 5, 2011, stating that ECCI was "required to work in conformance [sic] the contract, the geotechnical report, and approved plans. Any work stoppage and associated negative project impacts that occur as a result of the work stoppage is [sic] solely ECCI's responsibility. USACE will continue to work with ECCI to address any request for equitable adjustments through the established contractual processes." (R4, tab S-7) Mr. Crear's letter was drafted by Brad Long, the project engineer who had responded to ECCI's RFI (tr. 9/254).

29. Mr. Michael Johnson, who came on board as resident engineer at the end of September 2011, replacing Stan Dowdy, further researched the matter and commented in an email dated November 27, 2011, that it appeared to him "virtually conclusively that it was a negotiated award to ECCI. Based on this, we need to come to a resolution with ECCI to address the collapsible soil issue once and for all. Since we negotiated this award and we bought off on little or no mitigation for collapsible soil at award, we must make whole this matter via a mod and move on, regardless if we like it or not." Mr. Johnson was not called to testify at the hearing. Mr. Long, the project engineer,

testified that he received Mr. Johnson's email and then inquired of USACE's Kansas City District whether or not there was a bid item in the contract covering collapsible soil mitigation. He was informed, incorrectly, that the contract contained such an optional bid item covering mitigation work should collapsible soils be discovered. He then relayed this incorrect information to Mr. Johnson. (Tr. 9/248-53; R4, tab S-238 at 1) At some point after he left the project, Mr. Long learned that there was not an optional bid item in the contract, but he maintained that the work was called for by the specification and should have been included in the proposed price (tr. 9/257, 270).

30. ECCI proceeded to over excavate 300 mm under all building foundations, road, and parking areas on the MP/Signal School project, and ended up over excavating an additional 200 mm below that because they were not getting proper compaction at the original level (tr. 2/193-205; R4, tab S-657 at 2-3, tab S-321). On March 21, 2012, ECCI submitted a request for equitable adjustment (REA) for the direct costs of the additional work as well as the additional costs that ECCI incurred for its personnel and facilities during the 30 days that this work delayed the project completion time. The total amount requested was $814,310.84. (R4, tab S-8 at 1-3) ECCI did not charge for the additional 200 mm of over excavation (tr. 2/205).

31. Mr. Hayward testified that the collapsible soil mitigation work delayed the project by at least 30 days and possibly as many as 82 calendar days due to the need to perform the work under all the structures and the resulting impact on the critical path, which ran through the arch span buildings (tr. 3/19-22). He also testified that most of the mitigation work, approximately 83 percent, was performed on the MP School project, which had no requirement for collapsible soil mitigation in its technical specification, Section 01015 (tr. 2/36).

32. On May 2, 2013, ECCI submitted a certified claim for the $814,310.84 cost of collapsible soil mitigation on the MP/Signal School contract (R4, tab S-9). USACE never issued a contracting officer's final decision on the claim, and ECCI's appeal to the Board from a deemed denial was docketed as ASBCA No. 58993 on November 4, 2013.

*II. The BCOE Claim, ASBCA No. 60167*

The Period of Performance

33. USACE has an internal regulation which requires it to evaluate the biddability, constructability, operability, and environmental (BCOE) aspects of projects and ensure that a high degree of BCOE review is integrated into the construction procurement documents for all projects (Regulation No. (ER) 415-1-11; R4, tab S-555). Among the aspects of a project requiring evaluation is the period of performance (ER 415-1-11, Section 6 (b)(2); R4, tab S-555 at 4).

14

34.  The 365-day period of performance for the MP/Signal School project was driven by CSTC-A's request that the facilities be available for fielding ANA troops by mid-2012 (tr. 7/146-47, 9/95-96; R4, tab S-578, S-580, tab S-111 at 3-4).  NWK prepared a Project Management Plan (PMP) dated January 15, 2011, to control the award of the multiple Camp Shaheen projects, including MP/Signal School.  The PMP concluded that the MP and Signal Schools must be operational by April of 2012, and ready to house ANA troops by winter of 2011/2012 and that, therefore, "[t]he primary project objective is the construction schedule," while "Quality and Cost are secondary objectives."  (R4, tab S-587 at 74-75)  The PMP further noted that the "design criteria and standards developed by CSTC-A requires [sic] austere facilities with minimal finishes," "K-span standard designs...will be used to the greatest extent possible," and "customer and project objectives for the quality of this project include complete and usable facilities for the Afghanistan National Army (ANA) that conform to the 'Austere Design' standard." (*Id.* at 74, 76, 80)

35.  The BCOE review for MP/Signal School was assigned to and conducted by Kevin Lynch, an engineer who had previously deployed twice to Afghanistan for a total time in country of four years (tr. 4/149-153).  During his time there he acquired knowledge of common issues with construction projects in Afghanistan, and he participated in BCOE reviews with a focus on biddability and constructability.  In his experience, it was common for projects in Afghanistan to extend beyond the contract completion date.  (Tr. 4/154-55)  In performing his review of the MP/Signal School project, he made the following comment on the 365-day period of performance on February 17, 2011:

> Simply put, the Period of Performance (PoP) of 365 calendar days from NTP is NOT POSSIBLE.  It would be exceptionally challenging to complete a $30M+ contract in this amount of time here in the United States.  It has NEVER been done in Afghanistan.  This is a promise we know we will not keep.  I would strongly suggest that we utilize a formal PoP analysis prepared by an experienced scheduling consultant in order to determine the appropriate PoP.  Currently, the nice round one year PoP appears to be a SWAG.  I would bet it does not take such things as weather, Afghan holidays or the time of year for award into consideration.  We must communicate to our customer that this is not possible.  Without a formal analysis, I would recommend no less than 540 days, or longer.

(R4, tab 569 at 4)  Mr. Lynch in his testimony at trial explained that "SWAG" stands for "scientific wild-ass guess" (tr. 4/168).

15

36. The next day, Michael Coates, the design team lead for the MP/Signal School project, responded: "We agree with you in prin[c]iple. However, we were directed to use 365 days by AEN. We will send a request to AEN that they consider a longer period of performance and that they consult with Baker[10] on actual time to construct based upon the SOW, not just an [sic] customer requirement" (R4, tab 569 at 5). Mr. Lynch did not know if such a request was ever directed to AEN (tr. 4/174-75), and Mr. Coates testified that, to his knowledge, the request was not made. He searched his records and could not find such an email. (Tr. 9/96)

37. Mr. Lynch testified that his recommended PoP of 540 days or longer was based on his experience with projects in Afghanistan. He was frustrated that the Corps in Afghanistan routinely acquiesced in customer demands for periods of performance that it knew it could not deliver. (Tr. 4/164) What also routinely happened in Afghanistan was that the Corps was very liberal in granting time extensions. It was the rule, not the exception, according to Mr. Lynch, that every contract was late. And in terms of assessing liquidated damages, the Corps in Afghanistan had to balance its response. If they administered every contract by the letter, Mr. Lynch opined, they risked having the projects fail because there would be no incentive for the contractor to finish. (Tr. 4/180-81)

38. Although USACE did not request a formal PoP analysis from Baker Hill for the MP/Signal School project, they did so for its sister project at Camp Shaheen, Expansion Group A. The Group A analysis was performed by Philip DiSalvi. At the time of his testimony, Mr. DiSalvi had worked in construction for several decades, had about 25 years of experience with critical path analysis, and significant experience in both Iraq and Afghanistan on behalf of USACE training local nationals in scheduling techniques, helping contractors who were behind schedule to develop recovery plans, and doing period of performance analysis on a significant percentage of the 80 projects that Hill International worked on for USACE in Afghanistan over two years. (Tr. 5/136-41) His March 21, 2011 analysis of the period of performance for Group A, which was also 365 days, concluded that a reasonable schedule for the project should be no less than 520 calendar days if arch span construction was used, and 750 days if standard structural concrete was used. The analysis included likely weather delays but did not include a three week loss of productivity due to Ramadan. (R4, tab S-577; tr. 5/144-48) Additional assumptions that went into Mr. DiSalvi's recommended schedule were that, if arch span construction was employed, the contractor would use six arch-span forming machines with six experienced arch span erection crews (R4, tab S-577 at 1).

39. Frank Albert, the AEN engineer in Afghanistan acting as Program Manager for the ANA projects, emailed the Kansas City District/NWK on March 23, 2011 with

---

[10] Baker Group/Hill International were under contract to provide scheduling expertise and support to USACE.

regard to the Group A Expansion. He noted that a 520 day PoP had been recommended and that their customer, CSTC-A, had requested a 365-day PoP. He said:

> I am torn between customer wishes and what our scheduler recommends as a schedule; also what the experience of our field personnel will tell me. I believe they are managing some contracts now that have pretty aggressive schedules...and I don't know if these schedules have done us any good. To appease our customer, we have recently gone to Phased construction schedules. . . . Deliver "life support" facilities first, then the remaining work. If those Live [sic] Support features are at least delivered within the CSTC-A Fielding Date I recently provided, I believe we are delivering as best as we can for our customer. With that in mind, I would like our scheduler to review a possible phased schedule, to deliver the life support and supporting infrastructure first, then the other items of work. . . . I believe that you have a schedule of 365 days, based upon CSTC-A request. I just want to assure that the PDT is ok with requesting this schedule, vs. a possible phased schedule, which may take a bit longer for total construction, but which would provide for fielding support of troops earlier (barracks, DFAC, etc.). [T]his is a tough one; comes up all of the time with trying to meet the ever increasing fielding needs.

(R4, tab S-580) In response, NWK (Mike McCollum, PDT member) said that they had received comment on every project from former deployed personnel that the 365 days would not be met and that he concurred, but considered it the responsibility of AEN to notify the CSTC-A staff "as they turnover." Absent a document from CSTC-A requiring a phased turnover or alternate schedule, "we will be submitting the 365 day requirement." (R4, tab S-578)

40. At Mr. Albert's request, Mr. DiSalvi's analysis was revised on March 26, 2011 (R4, tab S-583). The revised analysis set forth assumptions that could result in a reduced period of performance:

**Three civil crews (460 day POP)**
- Should the cont[r]actor provide 3 civil crews including all necessary earth moving equipment, the POP can theoretically be reduced as follows.
  - Assuming the three civil crews starting work simultaneously in each of the main areas of work, the overall project duration could be reduced by 60 days.

17

**Working two 10 hour shifts per day (382 day POP)**
- Should the cont[r]actor work two shifts each day, the following would apply.
  - The schedule assumes the first 60 (+/-) days following NTP will be consumed by preconstruction efforts and early stages of design.
  - This condition leaves 460 days for construction.
  - Assuming two shifts per day, the construction duration (460 days) might be reduced by 30% for a revised construction duration of 322 days
  - When adding back the 60 days of preconstruction to the 322 construction days, the total POP would be 382 days

(*Id.* at 1)  The revised analysis further recommended RFP language to inform the bidders that the shorter period of performance was based on (1) using three civil crews, (2) working two full 10 hour shifts, and (3) providing 6 arch span forming machines and six experienced arch span erection crews.  As with the original analysis, Mr. DiSalvi warned that this schedule included average weather delays and Afghan national holidays, but not Muslim holidays such as Ramadan and Eid.  (*Id.* at 2)

41.  When Stan Dowdy, the Resident Engineer at Camp Shaheen, learned that the revised PoP analysis contemplated two 10 hour shifts per day, he emailed Mr. Albert to inform him that the ANA commander at Camp Shaheen might allow two shifts, but that he was "almost positive" that two 10 hour shifts would not be allowed (R4, tab S-585). Mr. Albert responded that perhaps by having the three civil crews work extended hours, just not 10 hour shifts, they could get to a 420 day PoP (R4, tab S-584 at 1). Donna Street, the AED Area Engineer, concurred in the 420 day PoP and recommended that the solicitation set out the assumptions underlying the PoP—three civil crews, extended hours, six arch span machines, etc. (*id.*).

42.  NWK proceeded to advertise the Group A Expansion project on March 29, 2011, with a 365-day PoP, and did not include in the solicitation any mention of the assumptions that the USACE engineers thought would be necessary to meet the schedule for a 420 day PoP (R4, tab S-733).  The award of the MP/Signal School contract was made shortly thereafter on April 8, 2011, again without any discussion of what would be necessary to meet the schedule, or any warning of limitations on the ability to work double shifts (R4, tab 11 at GOV000322).

18

43. At the time the MP/Signal School project was solicited, Dan McFerrin, ECCI's AFCEE[11] Program Manager, had managed multiple arch span projects in Iraq and had just finished ECCI's first arch span project in Afghanistan, for AFCEE/U.S. Air Force at Camp Bastion (tr. 1/109-10). Scott Hayward, ECCI's Program Manager for projects in Northern Afghanistan, had considerable experience both with projects in Northern Afghanistan and in managing fast-track projects for the U.S. Navy and for Kellogg Brown & Root at the time he oversaw preparation of the MP/Signal School bid (tr. 1/91-97, 100-04). In preparing ECCI's proposal for MP/Signal School, Mr. Hayward had the benefit of Mr. McFerrin's expertise and experience with arch span projects (tr. 1/109-10). ECCI had also completed the Tombstone project for AFCEE in Helmand Province, which was dangerous and a difficult place for construction, prior to bidding on MP/Signal. ECCI managed to erect 17 arch span buildings to house 800 commandos in five and a half months. (Tr. 4/228-30; R4, tab S-68 at 11) Several factors made this kind of speed possible.

44. First, the use of austere standards. Tombstone was a design build project. ECCI brought its arch span designs from Iraq and proposed them to the Air Force, who took them to CSTC-A and the Afghan commandos who liked them, so ECCI was able to use its existing austere designs and get the work done quickly. (Tr. 4/230) As Mr. McFerrin described:

> [It] was all sandwich panel. Very few ceilings. The latrines were built in such a way that centralized all the latrines with the exception of some of the officer's quarters and some of the U.S. Forces quarters. . . . There was some epoxy flooring, but very little floor finish. But the main things were that there were very few exterior wall finishes. . . . [A]ll the enlisted barracks, all of your warehousing, all of your operational training buildings had no sidewalls they were just the K-span foundation, the arch steel, the polyurethane with a coat sealer over it and that was the exterior wall.

(Tr. 4/230-31) Mr. McFerrin added that the stem walls were very small "compared to what we would later see," and more like the "classic" stem walls that ECCI learned from M.I.C. Industries, and that there were no fire boundaries or thermal insulation (tr. 4/231-32).

45. Austere standards were incorporated in the MP/Signal School contract. The version explicitly listed in the solicitation was the August 16, 2009 austere standards, but

---

[11] AFCEE, at the time, was the Air Force Center for Engineering and the Environment.

the contract specified that the "current" version was to be followed.[12] The "current" version was the updated version which was published on February 3, 2011, prior to issuance of the MP/Signal School solicitation on February 24, 2011 (tr. 1/127-29; R4, tab 11 at GOV000369, GOV000475; R4, tabs S-556, S-587 at 47). By the time the Expansion Group A solicitation was issued by NWK a month after the MP/Signal School solicitation, NWK had expressly incorporated the February 2011 austere standards guidance as the current version (R4, tab S-48 at 83). The austere standards that were followed by ECCI on the Tombstone project were also the CSTC-A February 3, 2011 austere standards, which were implemented by the Air Force on that project in advance of their publication (tr. 1/125-26). The ability to construct to the February 3, 2011 version of the austere standards figured prominently in ECCI's proposal to meet the 365-day PoP for MP/Signal School (tr. 1/132-33).

46. Second, fast tracking of design and over-the shoulder review. The Air Force team at Camp Bastion was co-located at Camp Bastion, so the review process for the designs on that project was expeditious. When a design was submitted, they pulled it up right away and either approved it or called ECCI and there would be a meeting at which they would review the design together and decisions would be made (tr. 4/232). Similarly, on the Tombstone project, the Air Force team was on site daily and did over-the-shoulder design reviews, and were willing to compromise and make quick decisions for the sake of speedy completion of the project (tr. 1/122-23).

47. A brigadier general at CSTC-A had actually visited ECCI's project at Camp Bastion with a colonel from AED South and was very pleased by the project and said he wanted to "see these everywhere." USACE shortly afterward began holding forums in late 2010 announcing its intent to speed up construction by shifting to arch span and employing austere standards in the design and construction of facilities for the use of the ANA. It also sent out requests ("sources sought") for expressions of interest from companies that had the capability to do accelerated construction, to which ECCI responded. (Tr. 1/110-12, 4/236-37) Mr. McFerrin attended a conference in Kabul held by CSTC-A and/or AED at which the future of arch span construction was discussed. The conference was attended by representatives of CSTC-A, USACE, and many prime contractors. (Tr. 4/237-38)

48. Against this background, ECCI also had access to the January 15, 2011 Program Management Plan Reachback Support to AED North (PMP) document (R4,

---

[12] Section 01010, para. 1. GENERAL, states in relevant part: "[t]he work within this contract shall meet and be constructed in accordance with *current* U.S. design and International Building Codes (IBC), Life Safety Code (NFPA-101), Force Protection and security standards." (Emphasis added) There then follows a partial listing of references, including the August 16, 2009 austere standards memorandum. (R4, tab 11 at GOV000369, GOV000475)

tab S-112) at the time it was preparing its proposal for MP/Signal. The PMP, prepared by the Kansas City District, covered the MP/Signal School project and other construction projects intended for use by the ANA, and provided guidance to follow in the solicitation and award of contracts on behalf of AED North. The PMP made it clear that the "primary objective is the construction schedule," and that cost and quality were secondary objectives. The PMP confirmed that the design criteria and standards developed by CSTC-A required austere facilities with minimal finishes. (R4, tab S-112 at 7-8) The clear message to ECCI was that the Corps was prepared to implement austere standards and fast tracking practices and otherwise administer the contract in such a way as to achieve completion in 365 days, consistent with CSTC-A's objectives (tr. 4/242-45).

49. Third, unfettered access to the work site, combined with the ability to work double shifts and/or longer hours. At its prior accelerated projects in Afghanistan, ECCI controlled access to the work sites (tr. 4/232). ECCI had done work at Camp Shaheen, under 2007 MATOC Task Order 8, and that project was just being finished as ECCI prepared to bid on the MP/Signal School project. ECCI had also done work outside the boundaries of Camp Shaheen on a range, and ECCI had experienced no restrictions on its access to the work site either inside or outside of the camp. The MP/Signal School site was located outside the boundaries of Camp Shaheen. Mr. Hayward testified that, typically, one would not expect additional restrictions outside the perimeter of a command space when there were no restrictions inside. (Tr. 1/150-52)

50. Additionally, Mr. McFerrin had met with the ANA Commander prior to the submission of ECCI's proposal, and came away from the meeting with a commitment from the Commander that ECCI management personnel would be able to access the work site from ECCI's logistic support area (LSA) for Task Order 8, which was on the base and very close to the fence line with the MP/Signal School site, through a side gate (Gate A) between the two contiguous sites (tr. 5/8-9, 12-13). The only restriction on using Gate A was that ECCI move out of it in the morning and move back through it in the evening and pre-organize the movements with the ANA security manager (*id.*). ECCI would also be able to fully control the ECP (entry control point) to the work site which was located outside the perimeter of the base, and through which ECCI's workforce entered the work site (tr. 5/12-13). Mr. McFerrin testified that ECCI knew from previous experience in contingency environments that if it could not control entry to the work site, it could not control its workforce, and that control of the ECP was critical to ECCI's decision that it could achieve an accelerated schedule (tr. 5/9-10).

51. Because it thought that it could control the ECP, ECCI did not anticipate any restriction on its work hours. Mr. McFerrin testified that ECCI had no reason to believe that its work hours would be constrained:

> I just can't conceive that we would have been restricted in hours. It wouldn't have occurred to me to say it [expressly in the proposal, that ECCI expected to work double shifts] because I never thought that as an accelerated project, we would ever encounter that.
>
> We checked to make sure we had access to the ECP, and that we controlled that. We controlled that. It was off the site of the installation. And we just knew that this was the perfect project because we would have control of our entry control point, and no one could tell us to restrict our hours. That's what we thought.

(Tr. 5/128-29) Mr. Hayward also testified that there was no way a project like MP/Signal School could be completed in 365 days without working in double shifts and being able to work "whenever you need to," and he concluded that ECCI would be able to do so based on the information in the solicitation that the contractor would control site security and that the project was located outside the installation. ECCI was not privy to the internal USACE email from Stan Dowdy warning that the ANA Commander would not allow two ten-hour shifts on the project, and there was no notice of potential restrictions in the solicitation. (Tr. 1/141, 151-52)

Contract Administration Following Award

Austere Standards

52. The austere standards contained in the February 3, 2011 CSTC-A Memorandum for Record were intended to "provide consistent criteria to construct sustainable garrisons and facilities [for the Afghan Army and Police] that can be constructed with speed, are easier to maintain, and generate lower lifecycle cost." CSTC-A expected that its detailed guidance "will be used by all who use Afghan Security Forces Funds," and allowed for only limited exceptions (R4, tab S-587 at 47).

53. The following provisions of the February 2011 austere standards are relevant:

> Facilities will be constructed using standard designs. These designs will be maintained by the U.S. Army Corps of Engineers (USACE) and updated with lessons learned during construction or as requirements change
>
> The basic building system for permanent facilities of 796 people or larger will be on-site fabricated arch steel structures, commonly referred to as K-Spans. No stem walls

are [sic] the preferred design, up to 1m high walls may be used if additional height is required for a specific function.

Codes . . . applicable to United States construction or U.S. Forces in CENTCOM do not apply to projects constructed for the ANSF . . . . Facilities do not have to be designed or constructed to NFPA, NEC, UFC 4-010-01, or other codes.

K-Span stem walls should be avoided whenever possible and not over 1m in height.

Polyurethane foam shall be used on the interior of all K-Spans to provide the maximum insulation possible.

K-Span walls will be left exposed with polyurethane insulation.

Doors and doorways do not need to meet fire boundary code standards.

Interior walls will be prefabricated metal sandwich panels. Interior walls do not need to meet fire boundary code requirements.

(R4, tab S-587 at 49-52)

54. The contract specifications contained some provisions that had not been updated to reflect the February 2011 CSTC-A guidance on the use of austere design standards. For instance, Section 01015 of the contract specifications for both the MP and Signal Schools, in paras. 3.10 and 3.13 respectively, called for insulated arch span roofing systems to be supported by reinforced concrete stem walls one meter high, regardless of whether the additional height was necessary for a specific function. (R4, tab 11 at GOV000416, GOV000513) The solicitation and contract also included "design concept drawings" for the design build facilities. These stemmed from the August 2009 austere design guidance, which required standard designs. Looking to comply with the 2009 guidance, USACE had contracted for its own designs which, by the time they arrived for use, were, in Mr. McFerrin's opinion, over-engineered and incompatible with the 2011 austere design guidance incorporated in the contract (tr. 5/31-32).

55. The MP/Signal School solicitation and contract referenced "standard designs," but these were for the site adapt facilities. In answering ECCI's pre-bid inquiries, USACE confirmed that the standard designs were to be strictly complied with for the site

23

adapt facilities and that the conceptual designs for the design build facilities could be modified:

> Question: This paragraph [Section 01010, para. 4.12.2, design build facilities] would suggest that standard[13] drawings provided for the listed facilities are only for reference and that the contractor is to provide its own design for each facility; is this correct?
>
> Government Response: Yes, contractor is responsible for completing the design. . . .
>
> Question: Can contractor assume that any drawing provided for the listed [design build] facilities can be modified to improve on the design, site adapt the design, and enhance the cost effectiveness of the design?
>
> Government Response: Site Adapt facilities shall be constructed as Site Adapt facilities. Design Build facilities are the responsibility of the Designer of Record. . . .
>
> Question: This paragraph [Section 01010, para. 4.12.3, site adapt facilities] would suggest that standard drawings provided for the listed facilities are to be constructed without deviation or modification for the listed facilities; is this correct?
>
> Government Response: Yes, this is correct.

(Pre-bid Inquiries and Responses Nos. 3840073, 3840092, and 3840068; R4, tab S-79 at 5-6)

56. We find that ECCI reasonably believed before bidding that any apparent disconnects in the solicitation did not present an issue. USACE had communicated its commitment to transitioning from a more cumbersome and time consuming construction process to a more rapid one using arch span construction and austere standards (findings 47-48). USACE's responses to pre-bid inquiries (finding 55) led them to expect that after award they would be able to use their own designs, which had been adopted by

---

[13] The term "standard drawings" was erroneously used in the cited paragraph 4.12.2, but in fact only non-standard conceptual designs were provided for the design build facilities.

CSTC-A and which formed the basis for CSTC-A's February 2011 guidance, as an improvement to the outdated conceptual designs in the solicitation (tr. 5/20-21).

57. Following receipt of the Notice to Proceed on May 2, 2011, ECCI met with USACE/AED at Camp Shaheen on May 28, 2011. One of the primary purposes of the meeting was to discuss use of the austere standards, and in particular the elimination of stem walls, on the MP/Signal School contract, since ECCI was in the process of designing the foundations for the buildings. Mr. McFerrin attended this meeting for ECCI. AED was represented by Donna Street, Mazar-e-Sharif Area Engineer and the Administrative Contracting Officer (ACO) on the MP/Signal School contract. (R4, tab S-159; tr. 1/162-63, 5/26, 28)

58. The elimination of concrete stem walls, in accordance with the austere standards in the contract, would save five to six weeks of construction time (tr. 1/133), and therefore was important to achieving the 365-day PoP (tr. 5/64). ECCI proposed at the meeting not only to eliminate stem walls, but also to erect the arch span buildings using the UBM (Ultimate Building Machine) rather than the ABM (Automatic Building Machine) system to form the steel spans.[14] Mr. Hayward testified that UBM is more practical because it creates vertical rather than curved walls (tr. 1/134). The ABM shape is a semi-circle, while the UBM is a vertical wall that a six-foot person can walk right up to, so you get more useable floor space with a smaller footprint (tr. 1/167). Instead of having to have window dormers manufactured offsite, shipped and then installed to fit the arch of an ABM building, you can erect straight walls and then put conventional windows in, which also saves considerable time (tr. 5/28).

59. Area Engineer Street did not discuss the proposal with ECCI and make a decision at the meeting, as the Air Force had. Instead, she requested that ECCI submit its proposal as a Request for Information (RFI). (Tr. 1/163) On June 12, 2011, ECCI submitted two separate RFIs (Nos. 5 and 6) requesting to use the UBM system, which would eliminate the need for stem walls (R4, tabs S-167, S-168; tr.1/167). USACE responded to RFI 5 requesting more design information (R4, tab S-167). USACE's processes were not set up for fast tracking design decisions. Design submittals on Afghanistan North projects went to AED's Engineering Branch in Kabul for review and analysis, through a system known as Dr. Checks (tr. 10/27-29). As Mark Hoague, the head of that branch, testified, he had a very small staff, between three and five people, and "couldn't keep up with dozens of construction jobs where somebody wanted to change something" (tr. 10/60). He stated that maybe they could have gone back to the consultant who provided the non-standard conceptual designs to AED and asked if the consultant had a problem with the elimination of the stem walls, but after the designs were delivered to AED at the end of April 2011, the consultants' task order was complete

---

[14] M.I.C. Industries introduced the UBM technology in 1994 as the successor to the ABM system (http://www.micindustries.com).

25

and USACE would have had to negotiate a new contract. So, as much as "I wanted to try to help get this stuff done," he and his staff were swamped "and I had to say no." (Tr. 10/60-61)

60. Mr. McFerrin testified that he knew the invocation of the RFI process was a bad sign for a project that was supposed to be accelerated (tr. 5/26-27). He had thought USACE was prepared to implement austere standards, but that turned out not to be the case. Mr. McFerrin believed that the USACE project management and contract administration people were working within a system that did not give them the authority to make the necessary decisions. (Tr. 5/30-31)

61. ECCI concluded that they had to choose between an extended design review process and moving forward with the project. Given the accelerated schedule and the pressure to procure materials and line up subcontractors, ECCI determined it did not have the time to spare, so the decision was made to move forward with the stem walls. (Tr. 1/168, 5/33-35)

62. USACE employees charged with administering the contract were either unaware or denied that the contract required the use of austere design standards. Mr. Albert, the AED Project Manager for MP/Signal School, testified that he remembered sending a memorandum on austere standards to NWK but did not recall that it was in the contract (tr. 10/176-77). Mr. Comeau, the Contracting Officer's Representative (COR) for the contract throughout 2012, testified that "[t]here are no references in the contract to austere standards." This assertion was based on doing a "word search" of the contract award package. (Tr. 8/220) He further testified that the contract had one reference to a memorandum "discussing austere conditions, but there is not [a] contract requirement for the implementation of austere as it was issued" (tr. 8/144, 8/203). It was not until after Mr. Comeau received a copy of a NATO Training Mission-Afghanistan (NTM-A) memorandum[15] providing criteria for implementation of austere standards, in May of 2012, that he began the process of modifying contracts to implement selected austere standards on the MP/Signal School project and ANSF projects generally (tr. 8/142-43; R4, tab S-311). The NTM-A September 5, 2011 memorandum that prompted Mr. Comeau to begin modifying contracts, including MP/Signal School, to adopt austere standards in May of 2012, was an update to the February 2011 CSTC-A memorandum that was already incorporated into the MP/Signal School contract. (*Compare*, R4, tab S-587 at 47 with R4, tab S-311)

63. By the time Mr. Comeau began modifying the MP/Signal School contract, it was too late to realize most of the benefits in terms of cost and time savings that would have accrued if USACE had allowed the use of austere standards at the inception of contract performance. The stem walls had already been built. It was too late to use

---

[15] NTM-A, in addition to CSTC-A, was a customer of USACE's in Afghanistan.

sandwich panels because those were long lead items that shipped from Dubai, and ECCI had already framed a lot of the interior partitions with metal studs. They were able to implement deletion of fire doors and fire boundaries. However, it was too late to implement deletion of the thermal barrier that ECCI was required to install over the polyurethane insulation and which ended up costing them a significant amount of time on the project. (Tr. 1/169-71)

Restricted Access to the Work Site and Restricted Working Hours

64. The MP/Signal School contract provided that all communication and coordination by the contractor with the host nation "shall be through and in full liaison with the Contracting Officer" (R4, tab 11 at GOV000344). Mr. La Rosa, who was the ACO on the contract from April 2013 through completion of the contract, testified that the CORs on the contract had an authorization letter that directed them to assist the contractor on issues related to site access, so both the CO and the COR had the authority and duty to assist the contractor with respect to that and other matters (tr. 10/257-58).

65. The Republic of Afghanistan had granted to the United States a Right of Entry to the work site for the purposes of the construction "without any interruption whatsoever by the HOST NATION or its agents" until transfer of the facilities by the United States to the Host Nation (Master Plan, Camp Shaheen & Camp Spann, Mazar-e-Sharif, R4, tab S-108 at 88-93). However, after ECCI started work, the ANA commander changed his position on access. He started by revoking permission for ECCI management personnel to access the work site through Gate A from its LSA. ECCI's workers were still able to access the work site by coming through the town of Dehdadi, outside the gate of the ANA base. Then, later in 2011, the ANA commander further restricted the movements of ECCI's workers with a pronouncement that they could not work any time before dawn or after dusk unless the workers were camped on the site overnight. In other words, transit would be allowed only during daylight hours. So, ECCI was limited to working as little as seven and a half hour days on the site during the winter, and while they could work longer shifts in the summer, they were never able to consistently work double shifts. (Tr. 1/153-54, 5/40-41, 55)

66. USACE (AED) was aware of the issue of restrictions on access to the work site through multiple notifications from ECCI at weekly meetings (tr. 5/47). ECCI first attempted to resolve the site access issue directly with the ANA commander without success (tr. 5/46). AED then went to the coalition commander responsible for training the ANA, and a security manager who was a Navy chief petty officer met with ECCI's security manager and the ANA commander, but to no avail. AED did not pursue or elevate the issue further after that to ECCI's knowledge (tr. 5/47-48), and there is no evidence in the record of any further efforts on the part of AED to facilitate ECCI's access to the work site.

67. The inability to work extended shifts, or up to 20 hours a day, was described by Mr. McFerrin as a "gut punch" to ECCI's productivity. Construction sites have only so many areas that can be worked in simultaneously, and the key to productivity is to be able to phase the work on and in a building so the different trades are not getting in each other's way. (Tr. 5/49-50) If they had known access and hours would be restricted, they would have planned the work very differently, and perhaps would have engaged a subcontractor who would build a man camp on the work site and bring in workers from tribes far away, because local workers would not tolerate not being able to go home after their shift. This option would definitely have been more expensive. (Tr. 5/50)

68. Mr. Hayward testified that the restriction to daylight hours prevented ECCI from extending the work day during a critical time when they needed to work inside the buildings to finish them out. The interior finishing work, such as the finishes, the studs for the partition walls, doors, hardware, lights, sockets etc., especially if not constructed to austere standards, is the most time consuming and labor-intensive part of the work. Lack of unrestricted site access slowed down this process because ECCI couldn't get the workers on the site for a full shift during the winter and couldn't do double shifts, and thus could not man the project to the extent that it planned to and otherwise would have. (Tr. 4/137-39)

69. Especially since they had been prevented from implementing austere standards, working extended hours was really the only way to get close to meeting the contract schedule (tr. 5/45). With both the use of austere standards and the ability to work extended hours denied, ECCI did what they could to speed up performance. They incentivized subcontractors and if that did not produce results, they changed out subcontractors. ECCI began procuring materials directly, and they began to perform more of the work themselves. (Tr. 5/52)

USACE Failed to Grant Reasonable Time Extensions during Contract Performance

70. During contract performance, Mr. Hayward testified, ECCI experienced a number of excusable or government-caused delays that justified time extensions for performance, but the government did not timely act on the requests for extension and instead continued to enforce the unrealistic 365-day PoP (tr. 1/216). Among the delays for which ECCI did not receive a time extension while performing the contract were: (1) government delay of the 65% design review and issuance of partial clearance for construction; (2) government direction to separate design packages for MP/Signal School and Expansion Group A projects after it had agreed to combine them; (3) suspension of work due to presence of human remains; (4) excusable delays to delivery of steel, foam insulation and thermal barrier; (5) 2011-2012 winter weather delays; (6) Afghan National Army interference in work (site access and work hours restrictions); and (7) government failure to provide electrical power for the project. ECCI had to file a certified delay claim after contract performance was complete, which was ultimately settled by

28

agreement of the parties effective September 21, 2016. The settlement included a total time extension of 294 days of non-compensable time, remission of liquidated damages assessed for those days, and an additional lump sum. (Gov't br., attach. 1)

71. USACE failed to grant time extensions during performance despite two separate recommendations from Baker/Hill scheduler Christopher McGinty. Mr. McGinty, in his review of ECCI's February 2012 schedule submission, said:

> This project will most likely have an overall duration of 550 to 600 days. That being said, the fact that this contractor is earning over $1,000,000 per month average over the last 4 months, is one of the more productive projects going on in AEN. The reality is, that this is a 600 day project. Recommend the COR do whatever it takes to continue to encourage the contractor to make substantial progress, including adding any additional time to the PoP that may be warranted.

(R4, tab S-672 at 2) In his May 2012 review of ECCI's schedule, Mr. McGinty reiterated that the "PoP for similar projects has been typically closer to 600 days from NTP" and that a PoP of 730 days was "right in line with what the typical PoP is for a project of this magnitude" (R4, tab S-678 at 1). Mr. McGinty testified at trial that in May of 2012, the project was making good progress and doing considerably better than most of the other projects in Afghanistan (tr. 5/185).

USACE Demanded Recovery Schedules, Issued Interim Unsatisfactory Performance Ratings, Withheld Funds, and Assessed Liquidated Damages

72. On December 13, 2011, USACE issued a Letter of Concern about ECCI's failure to make sufficient progress against the original 365-day schedule, which USACE was still enforcing by failing to grant time extensions for several excusable and government-caused delays, and demanded that ECCI submit a "recovery schedule." USACE also announced its intent to withhold 10 percent of future progress payments until such time as the project was "back on-schedule." (R4, tab S-245) In a letter dated January 13, 2012, USACE notified ECCI of its intent to begin withholding funds from Progress Payment No. 7 (R4, tab S-252). Thereafter, USACE withheld a total of $989,389.51 from Progress Payments 7-13, covering work performed from December 1, 2011 to June 30, 2012 (R4, tabs 43-49). On January 17, 2012, USACE issued a letter notifying ECCI that its current level of performance was considered unsatisfactory "and endangers the completion of this contract in a timely manner" (R4, tab S-258 at 1). At this point, the project schedule was 400 days, reflecting the only time extension that USACE had granted, 35 days for the government's relocation of the project site after award (R4, tab 13). ECCI responded, noting among other matters certain excusable and

compensable delays that had occurred up to that point but had not yet been accounted for by adjustments to the completion date (R4, tab 28 at 2).

73. On February 8, 2012, USACE issued a proposed interim Unsatisfactory Performance Evaluation, in which it stated that the project was about 30% behind schedule "with no viable solution to achieve" the contract completion date (app. br., ex. 3 at 2). Despite professional scheduler Chris McGinty's advice that the project was in reality a 600 day project, that it was one of the more productive projects currently ongoing in Northern Afghanistan, and that it should be managed accordingly, including the grant of warranted time extensions (finding 71), on May 5, 2012, USACE finalized and published the interim unsatisfactory evaluation on the government's Construction Contractor Appraisal Support System (CCASS), a database that is available to all government agencies to assess contractors' past performance. The published unsatisfactory evaluation did not include ECCI's extensive comments, and incorrectly stated that the contractor had neither signed nor commented. (App. ex. 4 at 1, 3)

74. When the contract completion date was reached, USACE still had not granted time extensions for the rest of the excusable and compensable delays ECCI had experienced. USACE began assessing liquidated damages of $960 per day and continued to do so throughout the remainder of ECCI's performance of the contract. (Tr. 2/21; R4, tab 11 at GOV000329 (Liquidated Damages Clause), tabs 66-68).

75. On November 14, 2012, USACE issued another interim unsatisfactory performance evaluation, which was published in CCASS on January 12, 2013 (R4, tab S-441). After the project was completed and accepted on November 11, 2013, USACE replaced this second unfavorable performance evaluation with a Final Performance Evaluation with an overall Satisfactory rating (app. ex. 2).

76. Mr. Hayward testified that USACE's enforcement of the original unreasonable schedule, by failing to grant reasonable time extensions during contract performance, assessing liquidated damages, and issuing unsatisfactory performance ratings, forced ECCI to take measures to accelerate performance to try to achieve the contract schedule (tr. 3/40-41). ECCI filed, on June 15, 2015, a certified claim for damages of $5,584,820 alleged to have been caused by the government's failure to cooperate with ECCI either to achieve the schedule or to extend the schedule to a reasonable length during performance of the contract (R4, tab S-75 at 2). USACE never issued a contracting officer's final decision on ECCI's claim and this appeal ensued.

### III. The DBA Premium Claim, ASBCA No. 60283

77. The MP/Signal School contract contained a provision requiring the contractor to obtain Defense Base Act (DBA) insurance (workers compensation insurance for foreign workers on U.S. contracts) and maintain it until performance was complete.

30

Paragraph 2.10 of Special Requirements, Contract Section 01060 (R4, tab 11 at GOV000599). Contract Line Item Numbers (CLINs) 0002 and 0004 required offerors to list the estimated amount of DBA premiums for price evaluation purposes, and stated that the actual amount paid by the government after award would be determined by the amount shown on the insurance company's invoice to the contractor. Further, "In the event of recalculation of the premium by CNA [Continental Insurance Company] based on actual payroll amounts, the contracting officer will adjust this CLIN by contract modification to reflect actual premium amounts." (R4, tab 11 at GOV000323-24)

78. The contract included ECCI's estimated DBA premium cost, including that of its subcontractors, of $96,048.74 for MP School and $63,903.46 for Signal School, $159,952.20 in total (R4, tab 11 at GOV000323-24; tr. 3/45). ECCI's subcontractors included their estimated premiums in the price of their firm fixed price subcontracts and ECCI did not separately reimburse its subcontractors' DBA premiums. Rather, the premium cost, as well as their other costs of performance, were reimbursed as ECCI paid invoices against the firm fixed subcontract price. (Tr. 3/59-62) On June 27, 2011, USACE reimbursed ECCI for the total initial DBA premium cost of $159,952.20 (R4, tab 37 at 1-2; tr. 3/47). DBA premium costs were also paid by ECCI and its subcontractors in subsequent years of contract performance (R4, tab S-713).

79. During contract performance, the SIGAR issued a report criticizing several aspects of the DBA program and, relevant to this appeal, "determined that CNA's process for billing and reimbursing contractors for DBA costs commingles funds in violation of U.S. funding restrictions and limits USACE and C-JTSCC [CSTC-A] oversight over actual costs." In summary:

> CNA's broker agent issues one policy per contractor—often including multiple contracts—and, at the end of the year, applies credits from contracts that had overestimated labor costs to contracts with underestimated labor costs. If these contracts have different funding sources, this process can violate U.S. funding restrictions. Furthermore, contracting officers lack oversight over actual DBA costs. For example, we found that contractors may purchase less DBA coverage than indicated in their contracts and receive refunds, but contracting officers are unaware when this occurs.

(R4, tab S-194 at 4) One of the ways in which USACE responded to this SIGAR report was to amend its DBA insurance contract to require that refunds of overpaid DBA premiums be sent directly to the government (tr. 3/51, 10/200).

80. The annual reconciliation of ECCI's master contract with CNA found that actual payroll for the MP/Signal School project was below what had been projected for

the 2010-2011 contract year. A refund of DBA premiums paid by ECCI in the amount of $64,283 was sent directly to USACE. (App. br., ex. 6 at 3; tr. 3/50-51, 10/220) USACE received the refund, and issued unilateral Modification No. P0004 adjusting the amount of CLIN 0002 to reflect "the actual premium amount paid" and decreasing the MP/Signal School CLIN 0002 contract price in the amount of $64,283 on September 27, 2012 (R4, tab S-40 at 2). The parties disagree as to a basic fact--whether this deduction from the contract price resulted in USACE recovering the amount of the refund twice.

81. ECCI's subcontractors had their own accounts with CNA for DBA insurance. They paid their premiums directly and provided ECCI with stamped invoices showing the amounts billed and paid. The initial premium amounts were included in the firm fixed prices of the subcontracts, and the amounts that ECCI was obligated to pay its subcontractors did not change if the premiums were revised. (Tr. 3/60-61) Two of the subcontractors underwent the reconciliation process with CNA and had their initial premiums adjusted based on actual payroll for the first 12 months of performance. Subcontractor [DEOA][16] had its premium for the period 2013-2014 reduced by $602, and this amount was refunded to USACE. Subcontractor [VENCO] had its premium for the period 2011-2012 reduced by $6,033, and this amount was refunded to USACE. None of the other subcontractors underwent the reconciliation process. (Tr. 3/62; R4, tab S-713)

82. In all, ECCI's subcontractors paid a total of $62,244 in DBA premiums during contract performance, $6,635 of which was refunded to USACE (R4, tab S-713). ECCI paid a total of $161,241[17] for DBA premiums on its own account during contract performance, $64,283 of which was refunded to USACE (app. br., ex. 6 at 3; R4, tab S-713). During a later reconciliation process, ECCI's premium for the 2011-2012 contract year was reduced by $13,189, which was not refunded to USACE and was applied by the insurer to offset other premiums owed by ECCI. ECCI therefore reduced the amount of premiums paid on its own account by the amount of the credit, to $148,052. (R4, tab S-713; tr. 3/56) The resulting total amount of premiums paid by ECCI during contract performance, including the subcontractor premiums, is $210,296 ($148,052 plus $62,244).

83. With regard to ECCI's subcontractors, USACE took the position that it would not reimburse premiums paid if the subcontractor had not gone through the reconciliation process. Mr. La Rosa, who was the contracting officer at the time that performance was completed, testified that at the end of the contract, an "audit" is

---

[16] The names of subcontractors in Afghanistan have been deleted from the public version of this decision for safety reasons pursuant to Board policy.

[17] This number is the sum of ECCI's initial payment of $69,669 for policy year 2010-2011, its initial payment of $46,842 for policy year 2011-2012, its revised premium of $39,965 for policy year 2012-2013, and its revised premium of $4,765 for policy year 2013-2014 (R4, tab S-713).

performed at the government's request. He stated that several of the subcontractors did not turn in their actual payroll numbers, so "we can't perform that part of the audit." (Tr. 10/204) It appears in context that he is referring to an audit by the insurance company, not by USACE, of the subcontractors' worksheets showing actual payroll numbers, e.g., the reconciliation process. And, Mr. La Rosa asserted that until USACE knew what the labor cost was for the subcontractors, "we cannot verify because we fall under the rules of the Government. We can't pay until we do verify." (Tr. 10/205) Mr. La Rosa did not cite to any particular requirement of law, regulation, or contract in support of this statement. He also acknowledged that subcontractors in Afghanistan sometimes "disappear" after they have finished their work. (Tr. 10/218)

84. The government maintains that it did not collect the $64,283 refund twice. It says it accounted for the $64,283 decrease in contract price effected by Modification No. P0004 on September 27, 2012 (R4, tab 18) only by retaining the refund, and that it never reduced any payment otherwise due to ECCI by the amount of the refund. (Gov't Proposed Finding of Fact (RPFF) 199; gov't br. at 99) However, the record indicates otherwise. Modification No. P0004 itself states that it reduces the contract price by $64,283. (R4, tab 18 at 1-2) Payment Estimate No. 15 reduces ECCI's contract earnings by $64,283 and shows a negative $64,283 on line L, for the amount due to the contractor (R4, tab 51 at 1). The last payment estimate in the record, No. 32 (presumably generated just before the payment due date of November 2, 2013), displays CLIN 0002, DBA insurance for the MP School contract, reduced from the original amount of $96,048.74 to $31,765.74, and in the total paid to date column, shows only $31,765.74 as having been paid. (R4, tab 68 at 2) Thus, more than a year following USACE's receipt of the refund and its unilateral Modification No. P0004 decreasing the contract price, USACE's payments to ECCI continued to be reduced by the amount of the refund and the decrease in contract price. The government has failed to direct us to any offsetting credit to ECCI.

85. We find as fact that USACE did indeed recover the $64,283 reduction in premium twice, first by receiving the refund, and second by reducing its payments to ECCI by the amount of the refund.

86. As to the subcontractor DBA premiums, USACE does not dispute that the invoiced DBA insurance premiums were paid by ECCI and its subcontractors (tr. 10/245). Rather, it insists that it cannot reimburse any amount unless and until the subcontractors have gone through the reconciliation process and any resulting adjustment to the paid premiums based on actual payroll vs. estimated payroll for the relevant periods (finding 83). ECCI contends, on the other hand, that the contract was clear that payment would be based on invoices stamped paid, and would be subsequently adjusted *if* premiums were adjusted as the result of the reconciliation process, but there was no requirement in the contract that a contractor or subcontractor undergo the reconciliation process (app. reply br. at 130). If ECCI is correct, the amount USACE owes ECCI for subcontractor premiums is $62,244. If the government is correct, the amount that it owes

33

ECCI for subcontractor premiums is $9,610—the total of initial DBA premium payments for the two subcontractors who underwent the reconciliation process.[18]

87. On January 14, 2015, ECCI submitted a certified claim for its unreimbursed DBA insurance premium payments (R4, tab S-73 at 18-19). On October 15, 2015, ECCI appealed from the deemed denial of its claim.

DISCUSSION

*I. The Collapsible Soils Claim, ASBCA No. 58993*

ECCI argues that the government knew of ECCI's pre-award interpretation of the contract to exclude collapsible soils mitigation, and by awarding the contract to ECCI, it is bound by that interpretation, citing *Cresswell v. United States*, 173 F. Supp. 805, 811 (Ct. Cl. 1959), and subsequent cases. ECCI also cites to decisions of the ASBCA holding that when the government accepts a contractor's proposal which alters the terms of the solicitation, the government is not entitled to demand performance of the original requirements. *See, e.g.*, *Marcon Eng'g, Inc.*, ASBCA No. 57471, 15-1 BCA ¶ 35,974. Therefore, it asserts, the government's direction to ECCI to proceed with mitigation of the soils at the site by over excavation of 300 millimeters, backfill, and compacting was a compensable change to the contract. (App. br. at 177-79, 202-08)

ECCI also argues that the discovery of slightly collapsible soils at the project site during the geotechnical investigation constitutes either a Type I or Type II differing site condition (app. br. at 212-18). As to Type II, where a contractor encounters unknown conditions at the site of an unusual nature which differ materially from those ordinarily encountered, ECCI points to its experience in Afghanistan and the fact that it had not encountered collapsible soils in its work at Camp Shaheen for three years, or more generally in the Mazar-e-Sharif area of Balkh Province during its work there. ECCI also states that it could not reasonably anticipate collapsible soils from the solicitation, since it contained no geotechnical information on the project site and the specification for the MP School, which was the larger of the two schools, contained no requirement for mitigation whatsoever (app. br. at 210-14). As to Type I, subsurface or latent conditions at the site which differ materially from those indicated in the contract, ECCI states that the lack of mitigation measures in the MP School specification, combined with the government's acceptance of ECCI's proposal stating that the probability of discovering collapsible soils at the site was very low, resulted in a contract that did not expect collapsible soils to be

_____

[18] The amount initially paid by the subcontractors is not subject to adjustment downward to account for the revised premiums, because USACE received those refunds directly and any downward adjustment reflecting the reduced premiums would result in double recovery by USACE.

encountered.  Therefore, ECCI believes it is entitled to an equitable adjustment for the cost of mitigation.  (*Id.* at 215-18)

The government counters, as to the existence of a differing site condition, that a Type I cannot be established on this record, because far from representing that there were no collapsible soils at the site, the solicitation provisions expressly raised the possibility that the site was underlain with collapsible soils and stated that the contractor had the responsibility after award for determining whether this was the case.  It further argues that a Type II cannot be established because, at the time of bidding, ECCI had in hand a geotechnical report from a project at Camp Marmal, 12 miles away from Camp Shaheen, that indicated the presence of collapsible soils with ASTM D-5333 collapse indices from 0.7% to 1.6%, and which recommended over excavation of up to 60 centimeters.  Moreover, at Camp Shaheen, while ECCI may not have observed any indications of damage to buildings, it did not have any geotechnical reports containing D-5333 test results to definitively demonstrate the absence of collapsible soils.  (Gov't br. at 120-24)

As to the contract interpretation issue, the government argues that the *Cresswell* doctrine cases cited by ECCI do not apply because, in those cases, there were facts establishing that the government knew about and considered the contractor's interpretation before overtly or impliedly accepting it.  Here, the government says, there is no evidence that ECCI's bid qualification was considered and accepted or even known to the government.  Because the qualification was in the price proposal, the technical evaluators would not have seen it and the price evaluators may not have realized its significance.  Thus, *Marcon Eng'g* is not applicable because in that case, the departure from the solicitation design was plainly set forth in the technical proposal and the technical evaluators were simply negligent in performing their evaluation.  (Gov't reply at 20-23)

We address the differing site condition theory of recovery first.  For the following reasons, we agree with the government that the facts of this appeal do not support ECCI's claim of a Type I or Type II differing site condition.  A Type I differing site condition is defined in the Federal Acquisition Regulation (FAR) as "subsurface or latent physical conditions at the site which differ materially from those indicated in this contract."  FAR 52.236-2(a)(1).  Thus, the elements to be proven are:  (1) the condition indicated in the contract differs materially from those encountered during performance; (2) the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; (3) the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and (4) the contractor was damaged as a result of the material variation between expected and encountered conditions.  *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1581 (Fed. Cir. 1987); *Zafer Constr. Co.*, ASBCA No. 56769, 17-1 BCA ¶ 36,776 at 179,234.

35

ECCI has not met its burden of proving the first element. The condition indicated in the contract was that there was a possibility that the site was underlain with collapsible soils. Specification section 01010 for both MP School and Signal School stated in para. 4.16 that the contractor's geotechnical investigation "shall specifically address the possibility that the site is underlain with collapsible soils" (finding 8). ECCI attempts to overcome this by arguing that by virtue of the government's acceptance of its pre-dispute interpretation that collapsible soil mitigation work was not included in the solicitation, the contract did not indicate that collapsible soils were present (app. br. at 215-16). We do not find this argument to be persuasive. ECCI's interpretation of an ambiguity in the specification regarding the mitigation work does not erase the solicitation's clear warning that collapsible soils might be encountered.

A Type II differing site condition is "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." FAR 52.236-2(a)(2). To establish a Type II differing site condition, the contractor must prove: (1) the recognized and usual conditions; (2) that the actual physical conditions encountered at the site were "unusual" (differed from the known and usual); and (3) that the different conditions caused an increase in the cost of performance. *Charles T. Parker Constr. Co. v. United States*, 433 F.2d 771, 778 (Ct. Cl. 1970); *Nova Group, Inc.*, ASBCA No. 55408, 10-2 BCA ¶ 34,533 at 170,329. Most important is proving the "unusual" nature of the condition encountered, "one that might not be reasonably be anticipated given the nature and location of the work." *Kilgallon Constr. Co.*, ASBCA No. 51601, 01-2 BCA ¶ 31,621 at 156,224.

The actual physical condition encountered by ECCI at the project site was collapsible soils with a negligible to slight collapse risk per the ASTM D-5333 test. ECCI did not encounter soils with a severe collapse risk. (Finding 20) ECCI's experience up to the time it submitted its proposal for MP/Signal School included three years of work at Camp Shaheen where it had not witnessed any damage to buildings built there without collapsible soil mitigation (finding 15). Up to that point, however, it had conducted no ASTM D-5333 testing of soils at Camp Shaheen. It had recently conducted a geotechnical investigation employing the ASTM D-5333 test, at a project site a Camp Marmal, 12 miles away. The reported results of that testing showed collapsible soils with negligible to slight collapse risk (indices ranging from 0.7% to 1.6%). (Finding 21) Collapsible soils were present throughout northern Afghanistan to a greater or lesser extent, with varying degrees of collapse risk, and their presence was known to both the government and to contractors there after the SIGAR report came out in April of 2010 (findings 10-11). Thus, we hold that encountering collapsible soils at Camp Shaheen does not qualify as an unknown condition of an unusual nature in and of itself. Had ECCI encountered collapsible soils with a moderately severe or severe collapse risk at Camp Shaheen (or anywhere in Mazar-e-Sharif), of a kind requiring extensive mitigation measures on the order of two or three meters of over excavation,

36

that might very well be a different matter. But ECCI encountered soils with a negligible to slight degree of collapse risk, a condition that was not unusual in Afghanistan and one that we think should reasonably have been anticipated.

However, we do not conclude that the work to mitigate the collapsible soils at Camp Shaheen was required by the contract awarded to ECCI. In this respect, we agree with ECCI that the government's acceptance of ECCI's proposal constituted its acquiescence to ECCI's clearly expressed interpretation of a solicitation ambiguity created by the government. Thus, we construe the contract, as awarded, to not require the mitigation of collapsible soils, and we conclude that the government's direction to ECCI to mitigate for the MP/Signal School project was a compensable change to the contract.

In matters of contract interpretation, the preferred approach is to read the entire contract as a whole, and to give the language of the contract its plain meaning. In doing so, different parts of the contract are to be read in harmony, if possible, and preference is given to an interpretation that gives effect to all the terms of the contract and does not render one or more of them meaningless. *Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 (Fed. Cir. 2000); *Christos v. United States*, 300 F.3d 1381, 1384 (Fed. Cir. 2002); *Air-Sea Forwarders, Inc. v. United States*, 166 F.3d 1170, 1172 (Fed. Cir. 1999); *United Pacific Ins. Co. v. United States*, 204 Ct. Cl. 686, 693-694 (1974). Pursuant to these principles, a court or board of contract appeals examining a contract such as MP/Signal School containing two separate but related projects and two different specification sections, one of which contains a requirement that is missing from the other one, might— without anything further to go on--conclude that a proper interpretation would be to read the missing section into both specification sections. This might be particularly true where, as in this appeal, the missing requirement has to do with ensuring that the soils underlying the two projects are properly prepared to support the weight of the buildings that will be resting on them.

However, there are three reasons why such a result is not correct in this appeal. First, there was a bidder inquiry about the discrepancy between the two sections. If in fact USACE meant for the requirement to be in both sections, it had the opportunity to say so in response to the inquiry. Instead, it threw open the door for bidders to make their own interpretations of the requirement with the response "bid it as you see it" (finding 9). The government's response created more ambiguity rather than less.

Second, if USACE had answered the inquiry by confirming that the Signal School specification for collapsible soil mitigation applied as well to the MP School, significant uncertainties would have remained. All the bidders would have faced the need to increase their bids by a significant amount to cover the possibility that collapsible soils would be encountered and three meters of over excavation would be required. ECCI estimated the additional costs as at least $2 million and possibly more like $5 million. (Finding 17) Since there was no reason to expect collapsible soils at Camp Shaheen to

the degree that had been experienced on the Kunduz plateau, bidders would have to decide whether to increase their bids by a significant amount and possibly lose the competition, or assume the risk of having to do the mitigation and expose themselves to a potentially substantial loss. Putting bidders in this dilemma runs directly counter to the government's best interest, because a bidder who did not price the full amount of mitigation might be unable or at least unwilling to complete the job if it faced substantial losses, and a bidder who included the full potential cost in its bid and was awarded the contract could potentially complete the job with a few million dollars of extra profit at taxpayer expense. In short, requiring bidders to price such a significant unknown quantity into a fixed price contract makes no sense from the perspective of either the government or the contractor.

Third, ECCI (and surely other bidders as well), taking the government at its word, told the government "how they saw it" in their proposal—they believed the probability of discovering collapsible soils at Camp Shaheen requiring anywhere near the specified level of mitigation was very low and so they were excluding any amount for mitigation from their bid and would view it as a changed condition if mitigation were required. "If one party to a contract knows the meaning that the other intended to convey by his words, then he is bound by that meaning. The same is true if he had reason to know what the other party intended." *Cresswell v. United States*, 173 F. Supp. 805, 811 (1959), and authorities therein cited. *See also Perry and Wallis, Inc. v. United States*, 427 F.2d 722, 725 (1970); *Ship Analytics Int'l, Inc.*, ASBCA No. 50914, 01-1 BCA ¶ 31,253 at 154,352; *Space Gateway Support, LLC*, ASBCA Nos. 55608, 55658, 13 BCA ¶ 35,232 at 172,957-58. Additionally, our own precedent holds that if the government accepts a proposal that varies the terms of the solicitation, the variation effectively changes the contract terms at award. *Marcon Eng'g, Inc.*, ASBCA No. 57471, 15-1 BCA ¶ 35,974 at 175,769-71.

It is undisputed that the MP/Signal School procurement was the very first one that USACE's Kansas City District had conducted on behalf of AEN (finding 19). It is also undisputed that at the time the MP/Signal School solicitation was issued, on February 24, 2011, USACE's policy on mitigation of collapsible soils was unsettled (finding 11). There were two major aspects to that policy that needed to be addressed. The first was determining the presence of collapsible soils and the severity of the risk, which would logically drive the mitigation procedures employed, including the extent of the over excavation. The other was how to address all of these unknowns up front in the solicitation to facilitate bidding.

USACE did not recognize collapsible soils as a significant issue until after the SIGAR's report on the collapse at Kunduz came out in April of 2010 (findings 10-11). The record is unclear about the point in time at which USACE began inserting collapsible soils provisions into its contracts. However, USACE began by requiring geotechnical investigations to include the ASTM D-5333 test to determine the severity of collapse risk

38

(finding 11).  By April 14, 2011, USACE adopted its policy of imposing mandatory over excavation and other mitigation requirements only for projects in Kunduz, and soliciting all other projects in Afghanistan with an optional bid item that would be exercised only if collapsible soils requiring mitigation were discovered after award (finding 14).  As to the degree of mitigation should collapsible soils be encountered, that too evolved over the course of 2011.  USACE abandoned its initial three meters of over excavation standard and by July of 2011 adopted a "tiered" approach to the amount of over excavation, geared to the degree of collapse risk identified by the ASTM D-5333 test.  By September 24, 2011, USACE guidance changed again, eliminating the requirement of over excavation for soils with a collapse index of 6% or less.  (Finding 23)

This evolution of approach played out in the changing solicitation terms that ECCI and other bidders saw coming out of the Kansas City District on behalf of AEN.  The design engineer who drafted USACE's March 23, 2011 response to the MP/Signal School bid inquiry of "bid it as you see it" was not called to testify.  However, the contract specialist who sent it out to the bidders, Jay Denker, did testify, and stated that he thought what was meant was that the contractors are there on the ground and should use their professional judgment.  (Finding19)  The government argues that the response "bid it as you see it" was meant to advise the bidders that "the risk involved in estimating what to bid regarding collapsible soils for the project rested with the contractor" (gov't br. at 126), but this assertion is practically meaningless since it amounts to USACE telling contractors something that they already knew, instead of answering their very real concerns about risk.  And, while we have ECCI's pre-dispute interpretation in the record, there is nothing in the record to tell us how USACE interpreted the mitigation provisions in the MP/Signal School specifications prior to this dispute arising.

There were multiple ambiguities and uncertainties for bidders inherent in the Signal School collapsible soils mitigation specification.  First, given that the specification was only for Signal School, did it apply to both projects, only to Signal School, or to neither?  Second, if it applied to one or both, what was the likelihood that collapsible soils would be discovered after award?  Third, if collapsible soils were discovered, how severe would the collapse risk of those soils be, and how much mitigation would need to be performed?  Even if the government's response to the bidder's inquiry in the MP/Signal School procurement had answered the first question, which it did not, the answers to the remaining two questions would have been impossible to ascertain until after award.  The likelihood of encountering collapsible soils, and the likely degree of mitigation work that would have to be performed, would both have to be known in order for bidders to have any chance of formulating a reasonable estimate of their costs to do the work and therefore be able to offer a firm-fixed price for that work.  The bid option that USACE adopted only one week after awarding the MP/Signal School contract resolved that dilemma, because bidders could much more reasonably estimate a price for mitigation of a known quantity of soil (5000 cubic yards).  That price could be extended to cover the actual amount of soil requiring mitigation.

39

Because collapsible soils was such a significant issue at the time, and because ECCI was quite clear and unambiguous in its proposal, it was highly unlikely that ECCI's notice to USACE that it was interpreting the solicitation not to include mitigation requirements could or should have escaped notice. While ECCI included its interpretation in the pricing section of its proposal (where it may not have been seen by the technical evaluators), both Mr. Denker, the contract specialist, and the CO who was acting as the Source Selection Authority had access to the entire proposal. Mr. Denker testified that as the proposals came in, he reviewed both the technical and price proposals before sending them to the evaluation boards. And Mr. Denker, in particular, was well aware of the fact that a bidder had asked for guidance on the subject and that the response he himself sent out to all bidders was "bid it as you see it." (Finding 19) Since he knew that bidders were invited to submit their own solutions to the issue, what they proposed ought to have been a particular focus of the proposal review that he conducted. We hold that regardless of the state of Mr. Denker's actual knowledge, or that of the Source Selection Authority (matters which were curiously not addressed by testimony at trial), how a bidder proposed to handle the collapsible soils issue was a matter that USACE "had reason to know" under *Cresswell* and its progeny. Both Mr. Denker and the Source Selection Authority either saw the bid qualification, or should have seen it; either way, whether by acquiescence or negligence, the government accepted ECCI's qualification when it awarded the contract without discussions.

We conclude that ECCI chose the only reasonable course open to it in the circumstances. The three meters of over excavation required in the Signal School specification was USACE's initial standard, but only a week after the MP/Signal School contract was awarded, USACE had backed off requiring it, even for projects in Kunduz where a known problem existed, unless "deep" collapsible soils were found (finding 13). ECCI's expectation that soils requiring that kind of mitigation would not be found at Camp Shaheen, based on the lack of observable damage to buildings over three years, (findings 15-16), was right on the money. The ASTM D-5333 testing done as part of the geotechnical investigation after award found the soil at the project site to have negligible to slight collapse potential (indices of .95% to 1.55%). ECCI began over excavation at a much reduced level of 300 mm (vs. three meters), one tenth of the depth specified in the Signal School specification, at the recommendation of the geotechnical report. (Finding 20) ECCI believed that even this reduced level was not necessary, and USACE itself appeared to agree when it adopted its September 24, 2011 guidance eliminating any requirement for over excavation for soils with a collapse index of 6% or less (findings 20, 23). However, USACE insisted nevertheless that ECCI continue with over excavation and other mitigation measures at the MP/Signal School site (findings 26, 28).

DECISION

The government is responsible for creating ambiguity in the solicitation and is bound by ECCI's reasonable and clear pre-award, pre-dispute interpretation. As a result, the contract as awarded did not contain any requirement to mitigate collapsible soils, and USACE's insistence that ECCI proceed with mitigation at the MP/Signal School project site was a constructive change to the contract entitling ECCI to an equitable adjustment.

In light of our decision, the government's pre-trial motion for summary judgment on the collapsible soils issue is dismissed as moot.

*II. The BCOE Claim, ASBCA No. 60167*

Affirmative Defenses and Jurisdiction

In post-hearing briefing, the government contended that the BCOE claim, at least as to ECCI's superior knowledge and commercial impracticability theories of recovery, goes far beyond what was presented to the CO in ECCI's certified claim submitted June 15, 2015, and constitutes new claims over which we lack jurisdiction since they were never decided by the CO. On October 29, 2021, the government filed a motion to dismiss ASBCA No. 60167 in its entirety for lack of jurisdiction, arguing that, in addition to the two "new" claims that were the subject of its post-hearing brief, the Board lacks jurisdiction over the theories of recovery (breach of the duty of good faith and fair dealing and breach of the warranty of specifications) presented to the CO in ECCI's original claim, because they are separate claims as to which ECCI failed to state separate sums certain. Appellant filed its opposition to the government's motion on December 29, 2021. On January 25, 2022, the Board issued its decision denying the government's motion as to the breach of the duty of good faith and fair dealing, breach of the implied warranty of specifications, and superior knowledge theories of recovery. It granted the government's motion as to ECCI's commercial impracticability theory of recovery. *ECC International, LLC*, ASBCA No. 60167, slip op. (January 25, 2022).

We next turn to the government's affirmative defenses, as to which the government bears the burden of proof. The government argues that: (1) ECCI waived its BCOE claim by entering into an agreement to participate in a settlement conference; and (2) the BCOE claim is foreclosed as settled and released, since the evidence presented all relates to seven delay claims that were settled in 2016. (Gov't br. at 99-102, 104-07)

The government and ECCI entered into an agreement, dated January 15, 2015, to participate in an "Executive Session" to attempt to reach settlement of disputes arising under a number of contracts, including the one at issue in these appeals (R4, tab S-74). Footnote 3 to the agreement states, in pertinent part:

> Any further claims, REAs, and appeals to the Board or to the
> Court of Federal Claims arising from any of ECCI's contracts
> with USACE, for projects performed in Afghanistan, under
> which performance has been completed as of the date of this
> agreement, must be submitted or filed with specific notice
> given to the Army Corps of Engineers, Middle East District
> Office of Counsel on or before May 15, 2015, provided that
> the (substantive, as opposed to procedural) transactions or
> occurrences underlying such claims, REAs, or appeals have
> occurred before that date. . . .  If any REAs, claims, or appeals
> (on completed Afghanistan projects) are not filed or
> submitted and brought to the attention of USACE prior to
> May 15, 2015, they shall be forever waived.

(*Id.* at 1 n.3)  The government contends that because ECCI's BCOE claim arose under a completed Afghanistan contract and was not submitted to USACE until June 15, 2015, that ECCI has waived the claim in its entirety.

At the hearing, the Board expressed doubt that it had jurisdiction to decide the government's waiver defense since it was based on a private agreement between the parties to enter into settlement talks, which is not an agreement within the purview of the Contract Disputes Act, 41 U.S.C. §§ 7101-7109 (tr. 2/8-10).  The government's post-hearing brief attempts to persuade us otherwise by citing to cases involving concluded settlement agreements or binding ADR proceedings (gov't br. at 99-101), neither of which are before us.  We therefore conclude that we lack jurisdiction to consider the government's affirmative defense of waiver based on a private agreement to negotiate a settlement.

Additionally, the BCOE claim was based on documents that ECCI received from the government in discovery shortly before the Executive Session began on June 9, 2015 (tr. 1/80 [gov't counsel]; R4, tab S-74 at 3).  Neither party disputes that the claim was unknown to ECCI before receipt of the documents in discovery.  Even if we possessed jurisdiction to consider the government's affirmative defense, the government, which bears the burden of proof, adduced no evidence showing that ECCI, when it entered into the agreement, intended to waive a claim that it did not know existed.  The agreement's language is no help to the government here.  The purported waiver does not expressly include unknown claims, and the words "appeals, claims and REAs" employed in footnote 3 imply that the matter is not only known, but is already part of the negotiation or disputes process.

We turn next to the government's affirmative defense that the BCOE claim was subsumed within a settlement agreement covering seven delay claims, executed on September 22, 2016.  ECCI objects to the government's attaching the settlement

42

agreement, which is not part of the record in this appeal, to its post-hearing brief without making or supporting a request to re-open the record. We have briefly cited to the settlement agreement in our findings of fact, and while we appreciate ECCI's point, we do not think that our limited reference to the agreement in our findings causes any harm to ECCI. Nor is consideration of the agreement necessary in order to rule on the government's affirmative defense.

The government contends, giving examples, that nearly every settled delay claim is cited by ECCI as evidence that the contract could not be performed in 365 days, in support of ECCI's claim that the government has breached its warranty of specifications (the period of performance) (gov't br. at 105-06). ECCI responds that its BCOE claim arises from the government's knowing imposition of an unreasonably short period of performance, and does not depend on any particular instance of delay, but on the government's overall administration of the contract in a manner that, far from facilitating ECCI's performance, actually made it more difficult to meet the schedule (app. reply br. at 92).

Despite the government's assertion that ECCI's BCOE claim is just a "new theory of liability in order to recover a second time" for the settled delay claims, we are satisfied that the BCOE claim is qualitatively different from a delay claim. ECCI's theories of recovery—breach of the duty of good faith and fair dealing, breach of the implied warranty of specifications, and breach of the duty to disclose superior knowledge, all allege that the government breached the contract and that its breach has caused ECCI to suffer damages by expending many millions of dollars more than it was paid, trying to achieve the contract's period of performance in the face of government contract administration at odds with the purpose of the contract. The damages sought by ECCI are distinct from the relief under the contract (time extensions, compensable delays, remission of liquidated damages) that would typically be granted on a successful delay claim.

This appeal addresses entitlement only, and we are not privy to the details of ECCI's BCOE claim for damages. Ultimately, we see the government's argument not as a bar to ECCI's pursuit of its BCOE claim, but more as a note of caution in the area of quantum of damages should ECCI prevail on its claim. If there is any potential overlap between the damages sought on the BCOE claim and the relief granted in settling the delay claims (a matter on which we express no opinion), that can be addressed, either in the parties' negotiation of quantum, or the Board's determination of same. We conclude that the settlement of seven delay claims does not bar ECCI from pursuing its BCOE claim.

Entitlement—Breach of Warranty of Specifications

ECCI advances three surviving legal theories of recovery under its BCOE claim. The first is that the contractual period of performance was a defective contract specification under which the government warranted that the contract could be completed in that time. ECCI also argues that the defective period of performance specification was a latent defect, in that ECCI could not know at the time of bidding that the government's own schedulers had concluded that the 365-day PoP was not achievable, or that none of the conditions that would in ECCI's experience have allowed ECCI to achieve the schedule (use of austere standards, real time over-the-shoulder design review, unrestricted access to the work site) would be allowed to occur. (App. br. at 63-93)

The government, on the other hand, argues that a due date in a contract is not a warranty by the government that the contract can be performed within the prescribed period, citing *Am. Ship Bldg. Co. v. United States*, 654 F.2d 75, 79 (Ct. Cl. 1981), and *Finast Metal Prods., Inc.*, ASBCA 19860, 85-1 BCA ¶ 17,873. The government contends appellant was a large and experienced contractor and it, not the government, was in the best position to determine whether it had the capabilities to complete the contract by the due date (gov't br. at 110-14).

In support of its argument, ECCI cites to *Appeal of Kora & Williams Corp.*, DCCAB No. D-839, 1994 WL 750301 (Mar. 7, 1994), for the proposition that the government's warranty of specifications includes the specified time for completion of the work. *Kora & Williams* involved a contract for demolition and construction of a parking and bus garage and station access at Union Station.[19] The D.C. Appeals Board found that the designer of the project committed numerous errors in the project design, and calculated the project duration without consideration of important mandatory construction phasing and sequencing detail:

> S & P has admitted that its designers spent all of one hour calculating the contract duration for the Union Station Project. (F.F.332). The calculation was made without benefit of a written schedule of activities or any real feasibility study. (Id.) Thomas Caruso testified that it should have taken up to two months to calculate the contract durations for the Link and overall Project (F.F.341); and accordingly, a written schedule of activities comprising 5% to 10% of the activities on the final CPM should have been generated by S & P. This would result in 250 activities on a summary bar chart. (Id.)

---

[19] Decisions of other boards of contract appeals are not binding precedent, although we may find them persuasive.

Caruso testified that it would be impossible to calculate accurate completion dates and contract durations for the Project using S & P's method. (Id.). S & P's design for the Project was criticized by the District and others for lack of detail. In particular, lack of sufficient construction phasing and sequencing detail was noted by the District as the design was developed. (F.F. 20, 21). Even after the design was 100% complete, the U.S. Department of Transportation was informed that S & P should have included "more detailed parameters" in the construction phasing plan relating to passenger access to railroad tracks during construction of the Link and Inbound Passageway. (F.F. 23). Later, the 900–day duration was called "intentionally tight" by the District, in an internal memorandum, "considering the necessary restraints involved in constructing in an area of intense pedestrian and railroad activity." (F.F. 333). The District even accused S & P, at a coordination meeting, of having "not considered the limitation created by the track outage requirements for properly sequencing construction activities." (F.F. 331).

As a result of S & P's failure to consider the impact of the phasing sequencing requirements on the project, Caruso concluded that the 900– and 550–day specified contract completion dates were not feasible for a contractor to meet. (F.F. 339, 340). The original contract completion durations were, therefore, a design defect. The District materially breached the contract when it refused to correct the design defects.

(*Id.* at 98)

From this opinion, we draw the conclusion that the cited lack of attention to construction phasing and sequencing detail on the part of the project designer resulted in numerous design errors, on top of which the designer's calculation of contract duration was faulty because it reflected the lack of phasing and sequencing detail in the underlying design. We are unable to embrace the broader conclusion, urged by ECCI, that a contract duration or period of performance, without more, can in and of itself constitute a design or specification defect.

In *Am. Ship Bldg. Co. v. United States*, 228 Ct. Cl. 220 (1981), the court reasoned that whether a requirement to perform in a set period of time is a due date agreed to by the contractor, or a warranty by the government, is a matter of contract interpretation. For a warranty to exist, the court stated, "there must be either an affirmation or a promise

which relates to performance under the contract," which may be express or implied. The court evaluated the actions of the parties and the surrounding circumstances, as well as the "realistic and legitimate expectations" of parties to government contracts, and concluded that there was no warranty by the government, but a due date that the contractor warranted it would meet by entering into the contract. The court also observed that how long it takes to perform a contract is a function of the specification requirement and the contractor's capabilities, and that normally the government knows only one of those, while the contractor knows both. *Finast Metal Prods., Inc.*, ASBCA No. 19860, 85-1 BCA ¶ 17,873 at 89,521 (citing *Am. Ship Bldg.*, 228 Ct. Cl. at 224-225).

In the absence of an affirmation or promise, express or implied, that amounts to a warranty of the performance period, applicable precedent requires that there be a defect in the design or the specifications with which the contractor is required to comply in order to bring the government's implied warranty of specifications into play. In *Laburnum Constr. Corp v. United States*, 163 Ct. Cl. 339 (1963), the delays the plaintiff experienced in completing the project resulted from deficient specifications, entitling the contractor to damages resulting from the government's breach of its implied warranty that the contractor, if he complies with the specifications, will be able to complete the project within the contemplated period of time. In *H&H Elec., Inc.*, ASBCA No. 29621, 86-3 BCA ¶ 19,303, the contractor claimed a price increase for a delay in contract completion caused by a defective specification. The original contract completion date was 450 days after receipt of notice to proceed. The Board found that the contract was objectively impossible to perform at the time of contract award because it required software that could not be developed within the 450-day period. It concluded that since the government was responsible for the content of the specification and set the time for performance of the contract, the government warranted to H&H that the contract was possible to perform at commercially practicable cost within the specified time. *Id.* at 97,603.

In this appeal, however, ECCI asserts that the 365-day PoP in and of itself constitutes a defective specification. In that respect, we find *Wunderlich Contracting Co. v. United States*, 351 F.2d 956 (Ct. Cl. 1965), to be illuminating. *Wunderlich* involved a period of performance of 540 days for a complex construction project, the final bid package for which contained numerous errors, omissions, and discrepancies. The Court of Claims observed that the errors in the bid package would for the most part have been apparent to an experienced bidder. The plaintiff and others urged the government to extend the period of performance, and in response a bid option was added to bid a longer period at higher cost, but plaintiff did not avail itself of the option. 351 F.2d at 961. The plaintiff then encountered circumstances that were not ideal in performing the contract. The progress of the work was found to have been substantially impeded by materials and labor shortages precipitated by the Korean War, and less substantially impeded by the errors and omissions in the drawings. The latter were

46

corrected reasonably promptly and were compensated for by the government on an ongoing basis with equitable adjustments. *Id.* at 962-63.

The *Wunderlich* court concluded that the plaintiff had not proven that the government-supplied documents were so substantially deficient or unworkable, in the context of a very complex construction project, as to constitute a breach of contract. Moreover, the plaintiff necessarily had knowledge of the actual state of the project plans and was cognizant of the fact that performance could be completed within 540 days only under ideal conditions. It chose not to bid an extended performance period but "willingly assumed the substantial risk of completing the project within the tight schedule of 540 days." *Id.* at 964. Therefore, the court concluded, the plaintiff had not established that the government breached its implied warranty of reasonable accuracy or that it was misled into assuming greater risks and responsibilities than it had anticipated. *Id.*

We think the same result is appropriate in this appeal. ECCI was aware that the solicitation contained conceptual designs based on outdated austere standards guidance that were inconsistent with the 365-day PoP, but believed that it would be able to implement its updated austere designs, or would be able to apply enough resources to the project to otherwise meet the PoP (findings 56, 67-69). We therefore conclude that the 365-day contract duration was not a warranty by the government that the contract could be performed within that time, and deny ECCI's breach of warranty claim.

Entitlement—Breach of Duty of Good Faith and Fair Dealing

ECCI's second theory of recovery is that the government breached its implied duty of good faith and fair dealing by imposing a PoP that it knew was not achievable under a business as usual approach, and then failing to cooperate with ECCI to implement any of the measures that would have made it achievable. ECCI points to the advice of USACE's own schedulers that the 365-day PoP was not achievable and to the testimony of USACE personnel that there would have been no point in conducting an analysis to establish a more realistic schedule because USACE did not want to raise the matter with its customer, CSTC-A. And while pre-contract actions in and of themselves cannot form the basis for a claim of breach of the implied duty, ECCI asserts that, with knowledge of the unreasonable PoP, USACE proceeded to administer the contract in such a way as to make it impossible for ECCI to achieve the PoP, while at the same time refusing to add time to the contract, even for excusable or government-caused delays. The government issued unfavorable interim performance ratings and started withholding payments and assessing liquidated damages in an effort to force ECCI to accelerate performance, but these measures had the opposite effect of substantially impeding ECCI's ability to perform. The government allegedly slow-rolled ECCI's efforts to implement the austere design standards contained in the contract, only partially implementing them in May of 2012 after it was too late to realize most of the time saving benefits the standards could have afforded. And, appellant contends, the government

47

failed to assist ECCI in obtaining unrestricted access to the work site, thereby preventing ECCI from implementing double shifts or extended hours, which were necessary to complete the work within the original schedule.  (App. br. at 95-123)

The gist of the government's argument with respect to breach of the implied duty of good faith and fair dealing is that:  (1) ECCI relies primarily on pre-contract actions to make its case, but under the applicable case law, the implied duty does not attach until a contract is formed; (2) a witness for the Corps testified that during his two years in Afghanistan, the Corps "bent over backwards" to help ECCI on this project because the Corps wants its contractors to succeed; (3) the implied duty cannot be used to expand a party's duties under the contract, and under the contract it was clearly the contractor's responsibility to comply with installation access requirements and not the government's to facilitate site access; and (4) the government's enforcement of the terms of the contract as awarded cannot be the basis of a claim for breach of the implied duty.  (Gov't br. at 117-20)

"Every contract imposes on each party a duty of good faith and fair dealing in its performance and enforcement."  *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)).  The covenant of good faith and fair dealing "imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."  *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).  While the implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions, it "prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value."  *Metcalf Constr.*, 742 F.3d at 991 (citing *First Nationwide Bank v. United States*, 431 F.3d 1342, 1350 (Fed. Cir. 2005)).  "The duty to cooperate is an aspect of the implied duty of good faith and fair dealing."  *Agility Pub. Warehousing KSCP v. Mattis*, 852 F.3d 1370, 1384 (Fed. Cir. 2017), (citing *Precision Pine & Timber, Inc. v. United States*, 395 F.3d 817, 820 n.1 (Fed. Cir. 2010)).

We begin our analysis by considering that USACE imposed a 365-day period of performance despite unanimous contemporaneous internal opinion[20] that the period of performance was far too short and should more appropriately have been at least 550-600 days.  While the implied duty of good faith and fair dealing does not attach before a valid contract is formed, "[t]his does not suggest that pre-contract actions by the government

---

[20] While two witnesses for the government testified at trial that they thought the 365-day period of performance could have been achievable, we find the contemporaneous expressions and actions of government personnel more deserving of weight.

cannot bear on the question of whether the government has complied with its obligations that are eventually imposed by the contract." *Scott Timber Co. v. United States*, 692 F.3d 1365, 1372 (Fed. Cir. 2012).

The USACE engineer who conducted the BCOE review for the MP/Signal School project, Kevin Lynch, had previously deployed to Afghanistan twice for a total of four years. He termed the 365-day period of performance "NOT POSSIBLE" and stated that "[i]t has NEVER been done in Afghanistan." He "strongly" suggested that a formal PoP analysis be done, and said "[w]e must communicate to our customer that this is not possible. Without a formal analysis, I would recommend no less than 540 days, or longer." (Finding 35) The next day, the NWK design team lead, Michael Coates, agreed with Mr. Lynch, but said "we were directed to use 365 days by AEN. We will send a request to AEN that they consider a longer period of performance." That request was never made, nor did NWK request that a formal PoP analysis be done. (Finding 36)

A formal PoP analysis was done for the sister project to MP/Signal School, the Group A Expansion at Camp Shaheen, which also had a 365-day period of performance. Philip DiSalvi, the Baker/Hill scheduler who did the analysis, also had considerable experience in Afghanistan. He recommended that no less than 520 days be allowed for construction, if arch span construction was used. (Finding 38) Frank Albert, the AEN engineer in Afghanistan acting as Program Manager for ANA projects, responded that perhaps a possible phased construction schedule delivering life support facilities first (Barracks, DFAC) and the remainder of the facilities later, would be more realistic but still deliver what USACE's customer needed. The response he received from NWK was that on every project former deployed personnel commented that a 365-day schedule would not be met, but that NWK intended to move ahead with the 365-day PoP unless they received a document from CSTC-A requesting a phased or other alternative schedule. (Finding 39)

USACE/NWK proceeded to advertise the MP/Signal School and Group A Expansion projects with a period of performance of 365 days, knowing that the 365 days was likely not achievable. Even assuming three civil crews working simultaneously, in two 10-hour shifts per day, with six arch span forming machines and six experienced arch span crews, Mr. DiSalvi was unable to bring the projected construction duration for the Group A project down to 365 days. NWK was also aware that the ANA commander at Camp Shaheen would not allow two 10 hour shifts. (Findings 40-42) None of this information was disclosed to potential offerors.

ECCI, on the other hand, thought that the schedule was aggressive but achievable because it believed, based on what it heard from USACE in meetings in late 2010, that USACE was committed to achieving accelerated construction in Afghanistan (finding 47). ECCI had experience with, and had successfully executed, accelerated construction in Afghanistan on Air Force projects (findings 43-44). While preparing ECCI's proposal, its

personnel had access to the January 15, 2011 Program Management Plan, prepared by NWK, that provided guidance to follow in the solicitation and award of contracts for the MP/Signal School project and other construction projects intended for use by the ANA. This document made it clear that the "primary objective is the construction schedule," and that cost and quality were secondary objectives. It also confirmed that the applicable design criteria required austere facilities with minimal finishes. (Finding 48) Given these clear and unambiguous pre-award messages from USACE, ECCI's belief was reasonable.

Following award, despite its knowledge of the unreasonable PoP, USACE failed to cooperate with ECCI either to achieve the schedule, or to extend the schedule, even for government-caused or excusable delays during contract performance. USACE was not prepared to administer the contract to facilitate its stated purpose of accelerated construction. The USACE AED personnel charged with administering the contract did not appear to be aware that speed was more important than quality or cost, or even that the contract, by its terms, contained the February 2011 version of the austere standards that their customer, CSTC-A, wanted to be used to speed up construction of ANA facilities in Afghanistan. (Findings 62-63) Rather, the USACE contract administration team and the USACE design team in Kabul hesitated to implement those austere standards and made it clear that ECCI would have to go through a time consuming RFI process for each requested departure from the specifications and conceptual design drawings in the contract, and that they had little time to review requested changes (findings 57-59).

The specifications and conceptual design drawings that were in the contract were based on the August 2009 version of CSTC-A's austere standards and thus were already outdated by the time that USACE publicized its commitment to accelerated construction in late 2010 and the updated austere standards came out in February 2011 (finding 54). USACE's insistence that ECCI adhere to the conceptual designs rather than the austere design standards in the contract was directly contrary to the purpose of the contract. USACE's customer, CSTC-A, wanted the facilities ready in 365 days and issued its February 2011 guidance which it meant to be followed to achieve accelerated construction for ANSF facilities. But while USACE incorporated that guidance into the contract, it then ignored it or denied its existence. The government correctly asserts that its enforcement of the terms of the contract as awarded cannot be the basis for a claim of breach of the implied duty of good faith and fair dealing. But the contract as awarded gave USACE the flexibility to approve designs that departed from the conceptual drawings and specifications in ways that were not only compatible with the most recent guidance, but were also better suited to achieve completion in 365 days (findings 55-56).[21] USACE chose not to do so.

---

[21] Even if USACE believed there was an actual conflict between the CSTC-A guidance and its conceptual designs, it could have resolved that conflict by referring to the contract's Order of Precedence clause, which would have given the CSTC-A

USACE also failed to assist its contractor in gaining the unfettered access to the work site that was necessary if ECCI were to work the double shifts and extended hours necessary to achieve the schedule in the face of USACE's failure to cooperate in allowing implementation of the current austere design standards. ECCI reasonably expected unfettered access to the work site. The work site was outside the perimeter of the base, and in its previous work both inside and outside the wire at Camp Shaheen, ECCI had experienced no restriction on access or work hours (finding 24). Following a meeting with the ANA commander, ECCI was confident it would be able to fully control the Entry Control Point (ECP) to the work site (finding 25). In addition, the Republic of Afghanistan had granted to the United States a Right of Entry to the work site for the purposes of the construction "without interruption whatsoever by the host nation or its agents" until transfer of the facilities by the United States to the Host Nation. Nevertheless, following award, the ANA commander began to impose restrictions on ECCI's access to the work site that culminated in ECCI only being able to work seven and a half hours per day during the winter instead of the 20 hours that they had been prepared to work (finding 65).

USACE contract administration personnel, both COs and CORs, had the authority and the duty to assist contractors on issues related to site access (finding 64). During contract performance, in response to ECCI's multiple notifications that their access to the work site was being restricted, USACE made one attempt to intervene on ECCI's behalf, and then failed to pursue or to elevate the issue further (finding 66). And USACE knew prior to award, but did not disclose to ECCI or other offerors, that the ANA commander was unlikely to allow two 10-hour shifts at the work site (finding 41).

Having failed to facilitate ECCI's access to the work site, and despite the negative impact of restricted access to the work site on ECCI's ability to make progress against the 365-day schedule through double shifts and extended hours, (findings 68-69), USACE refused throughout contract performance to grant relief from that schedule, either for government-caused and excusable delays, or in recognition that the original schedule was unrealistic—as urged by its professional scheduler (findings 70-71). Rather, USACE withheld funds, issued and published interim unsatisfactory performance ratings, and assessed liquidated damages against ECCI (findings 72-75).

We conclude that by advertising its intent to implement accelerated construction and austere design standards on the MP/Signal School project, and then administering the contract in a manner at odds with its stated purpose, USACE breached the covenant of good faith and fair dealing. USACE's failure to cooperate in achieving the schedule by

---

guidance precedence (as a referenced publication) over both specifications and drawings (finding 6).

51

implementing the current austere design standards, or by facilitating ECCI's access to the work site, deprived ECCI of the contemplated value of the contract. USACE's refusal to grant reasonable time extensions during performance, and its interim unsatisfactory performance ratings, withholding of funds, and assessment of liquidated damages had the punitive effect of forcing ECCI to try to accelerate to meet an unreasonable completion date. ECCI is entitled to recover its damages flowing from this breach.

Entitlement—Superior Knowledge

ECCI's third theory of recovery is under the doctrine of superior knowledge. ECCI asserts that USACE had superior knowledge that it withheld from ECCI, including that its professionals with knowledge of USACE projects in Afghanistan were unanimous that the project could not be completed within 365 days without providing the contractor with "full designs," which were not provided. ECCI was also unaware that USACE's scheduling consultant had recommended a PoP of 541 days to complete the comparable Group A Expansion project, which he concluded could be achieved within 382 days only by having three civil crews working simultaneously and working double 10-hour shifts. ECCI believed, based on prior experience and its meeting with the ANA commander, that its access to the work site, outside the perimeter of Camp Shaheen, would be unrestricted. However, USACE possessed knowledge that the ANA commander would be unlikely to allow two 10-hour shifts, and this was never disclosed in the solicitation. Finally, ECCI was unaware that despite its apparent desire to speed up construction in Afghanistan, USACE was entirely unprepared to make it happen. ECCI contends these facts would have been critical to ECCI's decision to bid, but while they were discussed internally by USACE, they were not made public in the procurement process. (App. br. at 123-30)

The government asserts that there is nothing in the record that supports a finding that the government withheld superior knowledge. Specifically, the government argues that appellant had years of experience working with USACE, and cannot reasonably claim that it was not in a position to know that USACE had no experience administering contracts in the way the Air Force had in order to achieve an accelerated schedule. Appellant was familiar with the way in which USACE administered contracts in Afghanistan. USACE contends it did not withhold knowledge that the contract was impossible to perform in 365 days; and there were no internal, "confidential" conclusions that the contract would be impossible to perform in 365 days. (Gov't br. at 115-17)

The doctrine of superior knowledge is generally applied to situations where (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware that the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information. *Hercules, Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994); *Scott Timber*, 692 F.3d at 1373.

USACE's pre-award BCOE provided it with the knowledge that 365 days was highly unlikely to be enough time, and a period more like 550 to 600 calendar days would likely be necessary to perform the contract. USACE was aware that ECCI did not possess this knowledge, since it was only discussed internally. (Findings 35-36) USACE was also aware that a period of performance of no less than 520 days had been recommended for the sister project at Camp Shaheen, the Group A Expansion. USACE knew that the only realistic prospect of shortening the period of performance involved working two 10-hour shifts throughout most of the period of performance (finding 40). Yet USACE also knew that this would likely not be allowed (finding 41). ECCI and the other bidders were not privy to USACE's knowledge of these vital facts, USACE knew they did not know, and USACE failed to provide the information to them.

ECCI was misled by the contract terms and USACE's expressed intent to engage in accelerated construction to believe that USACE would implement the February 2011 austere design standards and administer the contract so as to facilitate accelerated construction, and that the contract could therefore be performed in 365 days. USACE knew, but did not disclose, that it was unprepared to implement the February 2011 austere design standards, or to take any other measures to facilitate accelerated construction which were necessary to meet the 365-day PoP.

USACE's unwillingness to allow implementation of the February 2011 austere design standards required ECCI to perform costly and time consuming work that was not required under those standards, including the fabrication and installation of concrete stem walls for the arch span buildings, the framing and fireproofing of interior partitions instead of being able to use sandwich panels, and the installation of a thermal barrier over the polyurethane insulation instead of leaving it exposed (findings 53, 58, 63). ECCI believed it could have overcome this setback by applying enough resources to the project, most importantly working double ten hour shifts and extended shifts, to meet the original completion date. But then the ANA commander restricted access to the work site and effectively blocked the ability to work double shifts or even extended hours during a good part of the year, an action which USACE expected but did not warn ECCI about, and which ECCI had no reason to expect based on its past experience at Camp Shaheen. (Findings 65-69)

Finally, despite its undisclosed internal knowledge that the original period of performance was unrealistically short, and that it was unprepared to facilitate accelerated construction, USACE refused to grant reasonable time extensions during performance and engaged in punitive measures such as withholding funds, issuing unsatisfactory interim performance evaluations, and assessing liquidated damages against ECCI, all of which had the effect of making performance even more difficult and increasing the time and cost of performance (findings 70-76).

53

We thus conclude that USACE breached its duty to disclose superior knowledge, and that ECCI is entitled to recover the damages caused by that breach.

### III. The DBA Premium Claim, ASBCA No. 60283

With respect to ECCI's cost of DBA premiums for its own account, we have resolved the sole factual issue—whether or not USACE double-recovered a premium refund of $64,283 by also reducing the contract price and payments to ECCI by the same amount—in ECCI's favor (finding 85). There are no legal issues associated with these premium costs. Therefore, it is a matter of arithmetic. ECCI paid DBA premiums during contract performance on its own account totaling $161,241. Of that amount, $13,189 was used by the insurer to offset other amounts owed by ECCI. Therefore, the net amount of premiums paid by ECCI on its own account was $148,052. USACE has already received the benefit of the other downward adjustment of $64,283, which was refunded to USACE. (Finding 82) By decreasing the contract price by $64,283 and reducing payments to ECCI by that amount, USACE reduced its initial payment of $159,952 by $64,283 to a payment of $95,669 (findings 84-85). Thus, for ECCI's DBA premium payments on its own account, the government owes ECCI the sum of $52,383.

ECCI also reimbursed its subcontractors for their DBA premiums which were included in their subcontracts' firm-fixed prices (finding 81). We have previously found these DBA premiums to total $62,244 (finding 82). For the two subcontractors who underwent reconciliation and had their premiums adjusted downward, USACE has already received the benefit of that downward adjustment in the form of a refund of $6,635 (finding 81).

ECCI contends that the terms of the contract are clear: the government promised to pay based on the amount of the insurer's invoice, stamped "paid," which was to be submitted by the contractor after award (app. br. at 223). The contract further specified that, "in the event of recalculation of the premium by CNA, based on actual payroll amounts, the contracting officer will adjust [the contract CLINs] by contract modification to reflect the actual premium amounts paid (finding 77)."[22] ECCI has documented the amounts paid in DBA premiums ($148,052 for ECCI and $62,244 for its subcontractors), and USACE does not contest that the costs were incurred and paid. USACE originally paid the full amount of the estimated premiums, but subsequently reduced the price of

---

[22] The Board notes that this adjustment mechanism would have worked just fine if the contractor had received the refund. However, subsequent to award of the contract, the SIGAR report came out and USACE insisted on receiving the refunds directly from CNA. In the case of any refund directly received, a downward price adjustment in the amount of the refund, without a corresponding credit to the contractor, would have worked a double recovery for the government, as it did in this case.

CLIN 0002 of the MP School contract by $64,283, the amount of the refund it received directly from the insurer, and reduced its payments for CLIN 0002 accordingly. Thus, USACE has reduced its total payment to ECCI for DBA premiums to $95,669, and still owes ECCI $114,627. (App. br. at 22325)

USACE maintains that under FAR Part 31, which it contends applies to the determination of allowable cost under the DBA insurance contract CLINs 0002 and 0004, it is required to ensure that the costs of the contract are reasonable and adequately supported. Since the basis of the DBA premiums was the subcontractor's labor cost, without records showing subcontractor labor expenditures, USACE says it has no way of knowing whether all or part of the premium paid by the subcontractor was necessary to provide coverage for the actual labor force under the contract and was therefore reasonable (gov't br. at 142-45).

ECCI counters that USACE has not established the applicability of FAR Part 31 to the determination of cost under the DBA insurance CLINs. FAR 31.000 states that Part 31 contains cost principles and procedures for: (a) "the pricing of contracts, subcontracts, and modifications to contracts and subcontracts whenever cost analysis is performed (see 15.404-1(c)" and (b) "the determination, negotiation, or allowance of costs *when required by a contract clause*" (emphasis added). ECCI points out that USACE has not identified a clause in the MP/Signal School contract that requires that allowable costs be determined in accordance with FAR Part 31, nor has it argued that cost analysis was performed in connection with the pricing of any part of the contract (app. reply at 131).

USACE responds that ECCI is reading FAR 31.000 too restrictively, and that it does not mean that the contract must contain a clause that requires the determination, negotiation, or allowance of contract costs "in accordance with FAR Part 31," but rather that FAR Part 31 applies whenever the contract contains a clause that requires the determination, negotiation, or allowance of costs (gov't reply at 25-26).

We conclude that ECCI has the better argument. The MP/Signal School contract was advertised and awarded as a firm-fixed price contract. It contains the clauses normally found in a firm-fixed price construction contract.[23] Had it been a cost reimbursement contract, it presumably would have contained FAR 52.216-7, ALLOWABLE COST AND PAYMENT (DEC 2002), as prescribed by FAR 16.307(a). The Allowable Cost and Payment clause specifically conditions the reimbursement of

---

[23] These clauses included FAR 52.232-5, PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (SEP 2002); FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984); and FAR 52.249-2 TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) – ALTERNATE I (SEP 1996). (R4, tab 11 at GOV000327)

costs incurred by a contractor in performing the contract on a determination by the contracting officer that the costs are allowable in accordance with the terms of the contract and FAR Subpart 31.2.  Thus, it is an example of a contract clause requiring the application of Subpart 31.2 in determining allowable costs.  However, the MP/Signal School contract did not contain this clause, or any other contract clause incorporating the requirements of FAR Part 31.

Significantly, the government's argument, if accepted, would mean that FAR Part 31 would apply to a contract despite the absence of any actual contract clause incorporating FAR Part 31 and its requirements into the contract.  If that were the intent of FAR 31.000, it could simply state that the FAR Part 31 cost principles apply to the "determination, negotiation and allowance of costs" under all contracts.  But it does not say this.  It adds the qualifier "when required by a contract clause."  Thus, we cannot accept the government's proffered reading of FAR 31.000 because it nullifies these qualifying words in the regulation.

Additionally, we cannot accept the government's argument because the contract gave no notice that FAR Part 31 cost principles would be applied in determining the amount of DBA insurance costs that would be reimbursed.  For the contract's two CLINS for DBA insurance, the CLINs themselves informed the contractor how DBA insurance costs would be reimbursed—the actual amount paid by the government would be determined by the amount shown on the insurance company's invoice.  This amount was subject to adjustment by contract modification "*[i]n the event of* recalculation of the premium . . . based on actual payroll amounts."  (Emphasis added) (Finding 77)  No other circumstance allowing for adjustment of the amount paid was stated.  Moreover, there was no requirement for contractors or subcontractors to maintain or submit actual payroll records to the insurance company and go through the reconciliation process to be reimbursed.  USACE may have intended for this to happen, but it did not require it in the contract, and we will not read it into the contract after the fact.

Accordingly, we sustain ECCI's DBA premium appeal.  The sum owed to ECCI by the government for DBA premiums paid, in accordance with the terms of the contract, is $114,627, plus Contract Disputes Act interest on that amount from the date of claim submission, January 14, 2015, to the date of payment.

<u>CONCLUSION</u>

ASBCA Nos. 58993 and 60167 are sustained, and are returned to the parties for determination of quantum.  ASBCA No. 60283 is sustained in the amount of $114,627 plus Contract Disputes Act interest.

Dated:  February 24, 2022

LYNDA T. O'SULLIVAN
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

APPENDIX-- Glossary of Acronyms

Appeals of ECC International, LLC, ASBCA Nos. 58993, 60167, 60283

ABM—Automatic Building Machine
ACO—Administrative Contracting Officer
AED—Afghanistan Engineer District-North
AEN—Afghanistan Engineer District-North
ANA—Afghan National Army
ASTM—American Society for Testing and Materials
BCOE--Biddability, Constructability, Operability and Environmental
CCASS—Construction Contractor Appraisal Support System
COR—Contracting Officer's Representative
CSTC-A—Combined Security Transition Command-Afghanistan
DBA—Defense Base Act
ECP—Entry Control Point
LSA—Logistic Support Area
MATOC—Multiple Award Task Order Contract
NAVFAC—Naval Facilities Engineering Command
NTM-A—NATO Training Mission-Afghanistan
NTP—Notice to Proceed
NWK—Kansas City District, USACE
PDT—Project Delivery Team
PMP—Project Management Plan
PoP—Period of Performance
RFI—Request for Information
SIGAR—Special Inspector General for Afghanistan Reconstruction
TO—Task Order
UBM—Ultimate Building Machine
USACE--United States Army Corps of Engineers

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 58993, 60167, 60283, Appeals of ECC International, LLC, rendered in conformance with the Board's Charter.

Dated:  February 25, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals
